UNITED STATES OF AMERICA                                       PLAINTIFF

v.

BILLI JO SMALLWOOD                                             DEFENDANT

## MEMORANDUM OPINION AND ORDER

This matter is before the Court upon Defendant's Motion to Suppress (Docket #67).  The

government has responded (Docket #71).  Suppression hearings were held on June 16, 2010 and

August 26, 2010.  The parties have filed supplemental briefs (Docket #79, 82, 87).  This matter

is now ripe for adjudication.

## BACKGROUND

This case arises from a fire that occurred on May 29, 2007, at the Fort Campbell,

Kentucky, United States Army base.  Defendant Billi Jo Smallwood resided at 4137 Dixie Road,

unit D, with her husband, Wayne Smallwood, and three minor children.  In the early morning

hours of May 29, 2007, neighbors reported a fire at the Smallwood residence to the Fort

Campbell Fire Department.  Upon arrival, the firefighters discovered Billi Jo and Wayne

Smallwood, with their youngest child, outside the residence.  The other two children were still in

the house.  Firefighters attempted to rescue the two children, but neither survived.  Billi Jo

Smallwood was transported to Vanderbilt Medical Center for treatment of severe burns she

received during the fire.

After firefighters subdued the fire, Fort Campbell Fire Department Investigator Tom

Hurley entered the residence at approximately 7:00 a.m. to determine the cause and origin of the

fire.  He was accompanied by agents from the Army Criminal Investigations Division ("Army

CID").  Investigator Hurley's report indicates that Army CID agents were in the residence taking pictures of the scene prior to his arrival.  Investigator Hurley remained in the residence for approximately five hours, but could not determine the cause and origin of the fire.  He requested help from Kentucky State Fire Marshal's Office Inspector Allen Gregory.  The two worked together for several more hours.  They removed an electrical outlet from the home, but later determined that the receptacle was not the cause of the fire.

Agents also seized four paint cans containing fire debris from inside the home.  A hard drive, knife, documents, and a book were taken by agents from a desk that had been pulled out of the residence by firefighters.  A bomb squad searched the Smallwoods' vehicle.  Investigator Hurley found a military flash grenade in the upstairs hall closet.  A smoke detector, foam from a couch cushion, pistol box, cleaning brush, magazine, and some paper appear to have been removed from the house as well. All of these items were seized on May 29, 2007.  On May 30, Army CID did a walk-through of the scene at approximately 7:00 a.m., but did not seize any items.

On May 29, Special Agent Amber Wojner of Army CID noticed that the Smallwoods' car had been vandalized.  She ran an NCIC check and a COPS check of everyone in the residence to see if there was any history of threats against them.  Agent Wojner also interviewed EMS personnel who had transported Mrs. Smallwood.  She checked with family advocacy to see if the Smallwoods had any problems with their children, and asked the medical examiner to do a rape kit on the Smallwoods' deceased daughter.

On May 30, 2007, Agent Wojner contacted the Nashville office of the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") for additional assistance in determining the cause

and origin of the fire.  ATF Agent Mark Hoback responded to the call and recruited agents from the Tennessee Bomb and Arson Section.  On May 31, 2007, two days after the fire, Agent Hoback and Tennessee Bomb and Arson Agent William Barker met Special Agent Matt Cummings and Agent Kalmes from Army CID at Vanderbilt Medical Center to interview Mrs. Smallwood.

According to Agent Hoback, it is common to talk to those who were present at the scene of a fire when investigating the cause of the fire.  Agent Hoback asserted that his interview with Mrs. Smallwood was for the purposes of determining what happened and what caused the fire, and she was not a suspect at the time of the interview.  He did not read Mrs. Smallwood her *Miranda* rights.  At the time of the interview, Mrs. Smallwood was lying in a hospital bed.  She was bandaged and taking various medications.  Although Agent Hoback was unaware of the medications Mrs. Smallwood was currently taking, he noted that she was coherent and responsive throughout the interview.  Mrs. Smallwood's psychiatry consultation form from that same day indicates that she had not been sleeping since the night of the fire, the nursing staff described her as manic, and she was not oriented as to time.  The report also indicates that Mrs. Smallwood was on several medications, ranging from morphine and Valium to multivitamins and Tylenol.

Following his interview with Mrs. Smallwood, Agent Hoback traveled to Fort Campbell. His team first helped verify that the electrical outlet was not the cause of the fire.  Next, Agent Hoback went to the Smallwood residence.  This was the first time ATF and Tennessee Bomb and Arson agents were present at the scene.  The agents also brought an accelerant detection canine. Upon entering the home on May 31, 2007, the dog alerted to the presence of accelerant.  At this

time, everyone in the residence exited the building.  ATF Agents Kurt Thielhorn and Kurt

Meuris arrived shortly thereafter.  The agents decided to seek consent from Billi Jo and Wayne

Smallwood to enter and search the residence .  Army CID and ATF personnel were sent to obtain

this consent.  Both Mr. and Mrs. Smallwood gave their consent to search.  At this time, it was

approximately 11:00 p.m. on the evening of May 31, 2007.  Agent Thielhorn testified that a few

people went back into the residence after consent was obtained to collect carpet samples, but it

was too dark for any further investigation.

On June 1, 2007, agents from ATF, Tennessee Bomb and Arson, and Army CID

continued their investigation of the scene.  Agent Meuris led the fire investigation at the

Smallwood residence.  Agent Thielhorn began interviewing witnesses.  Agent Thielhorn

interviewed Mrs. Smallwood at the Vanderbilt Medical Center on June 6, 2007.  Army CID

Agent Cummings was also present at that interview.  Although agents confirmed arson as the

cause and origin of the fire prior to the interview, Agent Thielhorn testified that Mrs. Smallwood

was still not a suspect at this time.

Prior to speaking with Mrs. Smallwood, Agent Thielhorn spoke to two doctors about

Mrs. Smallwood's condition.  These doctors informed Agent Thielhorn that it was fine to

interview Mrs. Smallwood, and that she was not on any medications that would distort her

recollection or alter her statements in any way.  Mrs. Smallwood's psychiatric consult form

indicates she was on fifteen medications that day, including Valium and Paxil.  The report also

indicates that her speech was clear and cognition adequate.

The agents informed Mrs. Smallwood that they were going to record the conversation.

Agent Thielhorn testified that Mrs. Smallwood expressed interest in talking to him and never

indicated an unwillingness to speak. Further, Agent Thielhorn stated Mrs. Smallwood never appeared incoherent or disoriented during the interview. He described the interview as "normal conversation." At this point in time, Agent Thielhorn considered Mrs. Smallwood a "person of interest." She was not given any *Miranda* rights.

Agent Thielhorn spoke with Mrs. Smallwood a number of times after the June 6th interview. He recorded some of these interviews. These encounters took place over the phone, at Mrs. Smallwood's residence, through email, and at the Army hospital. Agent Thielhorn testified that at no time did he tell Mrs. Smallwood that she was in custody or not free to leave. He also testified that he had no plans to arrest her during any of these interviews. On July 2, 2007, Agent Thielhorn asked Wayne and Billi Jo to take a polygraph examination. No further interviews occurred after that date.

Mrs. Smallwood was indicted on November 13, 2008, for malicious damage and destruction by fire to property owned by the United States and malicious damage and destruction by fire to property owned by the United States resulting in deaths. She was arrested on November 18, 2008. This case is now set for trial on October 18, 2010.

## DISCUSSION

Defendant has moved to suppress all statements given to law enforcement agents during investigation of her case and all evidence seized from her residence after the fire. The Court considers these two issues separately.

## I.    Suppression of Defendant's Statements

"The Fifth Amendment prohibits the prosecution's use of a defendant's compelled testimony." *Ledbetter v. Edwards*, 35 F.3d 1062, 1067 (6th Cir. 1994) (citing *Oregon v. Elstad*,

470 U.S. 298, 306-07 (1985)). "A statement is not 'compelled' within the meaning of the Fifth Amendment if an individual 'voluntarily, knowingly and intelligently' waives his constitutional privilege." *Colorado v. Spring*, 479 U.S. 564, 573 (1987) (quoting *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)). Any use of involuntary statements in a criminal trial is a violation of due process, and such statements are inadmissible. *See Mincey v. Arizona*, 437 U.S. 385, 398 (1978).

"Whether a person's due process rights were violated in the course of taking his statement hinges on the voluntariness of the statement." *United States v. Rutherford*, 555 F.3d 190, 195 (6th Cir. 2009) (citing *Colorado v. Connelly*, 479 U.S. 157, 166 (1986); *United States v. Johnson*, 351 F.3d 254, 260 (6th Cir. 2003)). The Court looks to the totality of the circumstances in analyzing the voluntariness of a statement. *Id.* (citing *United States v. Greene*, 250 F.3d 471, 479 (6th Cir. 2001)). The totality of the circumstances can include such factors as "age, education, and intelligence of the defendant; whether the defendant has been informed of his *Miranda* rights; the length of the questioning; the repeated and prolonged nature of the questioning; and the use of physical punishment, such as deprivation of food or sleep." *McCalvin v. Yukins*, 444 F.3d 713, 719 (6th Cir. 2006) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)). The Court should consider three factors: whether "(i) the police activity was objectively coercive; (ii) the coercion in question was sufficient to overbear the defendant's will; and (iii) the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statement." *Rutherford*, 555 F.3d at 195 (quoting *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999)).

An accused is entitled to the reading of his or her *Miranda* rights only when he or she is interrogated while "in custody." *Thompson v. Keohane*, 516 U.S. 99, 102 (1995). Interrogation

is "'express questioning or its functional equivalent.'" *Tolliver v. Sheets*, 594 F.3d 900, 917 (6th Cir. 2010) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980)). The Sixth Circuit applies the following analysis when considering whether a suspect is in custody:

> "[T]he issue of whether a suspect is 'in custody,' and therefore entitled to Miranda warnings, presents a mixed question of law and fact qualifying for independent review." *Thompson v. Keohane*, 516 U.S. 99, 102, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995). For an individual to be "in custody," there must be "a formal arrest or restraint on freedom of movement of the degree associated with formal arrest." *Thompson*, 516 U.S. at 112, 116 S.Ct. 457 (citation and internal quotation omitted). In determining whether a suspect is "in custody" for purposes of applying the *Miranda* doctrine, "the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). *See also Thompson*, 516 U.S. at 112, 116 S.Ct. 457 (stating that the custody determination hinges upon whether, "given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave").

*Mahan*, 190 F.3d at 421.

Defendant seeks to suppress all statements made to law enforcement officials. Agents interviewed Defendant in the hospital on May 31, 2007, and June 6, 2007. Although there is evidence that Defendant spoke with Agent Thielhorn on several occasions after these two interviews, Defendant's motion focuses on the fact that she was lying in a hospital bed and heavily medicated as reasons for exclusion. All communications after June 6, 2007, occurred following Defendant's release from Vanderbilt Medical Center. Therefore, the Court sees no reason why any statements made after the June 6, 2007, interview should be suppressed, unless they are considered fruit of the poisonous tree. Therefore, the Court must first address the two hospital interviews.

A.      *May 31, 2007 Interview with Agent Hoback*

The first interview with Defendant occurred on May 31, 2007, less than three days after

the fire at Defendant's residence. Defendant was lying in a hospital bed with bandages on her legs. She had been through two surgeries in the past two days and she was on several medications. At least four law enforcement agents were present at the time Defendant was interviewed. Although Agent Hoback is uncertain, he testified that the interview likely lasted at least an hour.

Defendant believes *Mincey v. Arizona*, 437 U.S. 385 (1978), is controlling and demands suppression of the May 31st interview. In *Mincey*, the defendant, Rufus Mincey, was wounded in a shoot-out with police officers in which Mincey allegedly killed one of the officers. *Id.* at 387. Mincey was immediately transported to the emergency room for treatment. *Id.* at 396. That evening, he was informed he was under arrest, read his *Miranda* rights, and then interrogated by a detective for approximately four hours. *Id.* Because Mincey was intubated, he wrote his answers on pieces of paper provided by the hospital. *Id.* The Supreme Court held that Mincey's statements must be excluded, because they were not "the product of a rational intellect and a free will." *Id.* at 398 (citations omitted). In reaching this decision, the Supreme Court focused on Mincey's condition:

> [Mincey] had been seriously wounded just a few hours earlier, and had arrived at the hospital "depressed almost to the point of coma," according to his attending physician. Although he had received some treatment, his condition at the time of [the detective's] interrogation was still sufficiently serious that he was in the intensive care unit. He complained to [the detective] that the pain in his leg was "unbearable." He was evidently confused and unable to think clearly about either the events of that afternoon or the circumstances of his interrogation, since some of his written answers were on their face not entirely coherent. Finally, while Mincey was being questioned he was lying on his back on a hospital bed, encumbered by tubes, needles, and breathing apparatus. He was, in short, "at the complete mercy" of [the detective], unable to escape or resist the thrust of [the detective's] interrogation.

*Id.* at 398-99. The Supreme Court also noted that Mincey clearly told the detective more than

once that he did not wish to be interrogated further without the assistance of a lawyer. *Id.* at 399-401. The detective only ceased interrogation when Mincey lost consciousness or received treatment. *Id.* at 401. Looking at all the circumstances, the Supreme Court found that Mincey's "will was simply overborne." *Id.* at 401-02.

The Court finds that the present case is easily distinguishable from *Mincey*. First, Mincey's interrogation took place on the same day as his injury, while Defendant was not interviewed until at least two full days later. In addition, Mincey was intubated and unable to speak, while Defendant was able to speak clearly to Agent Hoback. Although Mincey lost consciousness during his interrogation, Defendant was fully conscious throughout Agent Hoback's questioning. Defendant never requested to cease the interview, nor did she request an attorney. Unlike Mincey, Defendant did not indicate any confusion; instead, Agent Hoback described Defendant as coherent, calm, and responsive. Further, Mincey described his pain as unbearable, while Agent Hoback noted that Defendant may have been merely uncomfortable at times. Finally, Mincey was told he was under arrest and read his *Miranda* rights at the time of his interrogation. In this case, Defendant was not under arrest, although there is some debate as to whether she was a suspect at that time.

"Coercive police activity is a necessary element for finding that a confession was involuntary." *Abela v. Martin*, 380 F.3d 915, 928 (6th Cir. 2004) (citing *Colorado v. Connelly*, 479 U.S. 157, 167 (1986)). The Court in *Abela* found that the defendant had failed to present any evidence of police coercion, even though he was interrogated in the emergency room prior to treatment of his injuries, was uncomfortable to the point of vomiting, and was on medication. *Id.* "Evidence that a defendant suffered, at the relevant time, from a condition or deficiency that

impaired his cognitive or volitional capacity is never, by itself, sufficient to warrant the conclusion that his confession was involuntary for purposes of due process; some element of police coercion is always necessary." *United States v. Newman*, 889 F.2d 88, 94 (6th Cir. 1989). Therefore, Defendant's mental condition at the time of the interview is irrelevant unless Defendant can show police coercion.

Agent Hoback testified that Defendant was never threatened, nor did she express any unwillingness to speak. Defendant's only allegations of police coercion are that there were six law enforcement personnel in the room at the time of the interview and an Army soldier stationed outside Defendant's hospital door.

First, there is a factual issue as to exactly how many law enforcement agents were present to conduct the interview. Both Agent Hoback and Agent Thielhorn testified at the suppression hearing that at least one soldier from Mr. Smallwood's unit was present in Defendant's hospital room. Although Agent Hoback believed there were only four agents present who were part of the investigation, Agent Barker's report indicates that there were two agents, two CID officers, and two Army officers. The identities of the two Army officers remains unclear. Even so, the Court does not believe that the presence of four to six law enforcement agents is sufficient evidence of police coercion, or "police overreaching." *Connelly*, 479 U.S. at 164. In *Blackburn v. Alabama*, 361 U.S. 199 (1960), the Supreme Court found police coercion in an instance where there were numerous police officers in an interrogation room. This was coupled, however, with evidence that the interrogation lasted nearly nine hours, the room was tiny, no friends or legal counsel were present, and one of the officers composed the confession for the defendant to sign. *Id.* at 207-08. Here, there is no evidence that the interview lasted an unusual length of time or

that the room was overcrowded.  The agents did not prevent Mrs. Smallwood from receiving treatment, food, or sleep.  *See, e.g.*, *Greenwald v. Wisconsin*, 390 U.S. 519 (1968); *Reck v. Pate*, 367 U.S. 7373 (1966).  In fact, evidence that a soldier from Mr. Smallwood's unit was allowed to remain in the room speaks against coercion: Agent Hoback testified that he allowed the soldier to remain to make Defendant feel more comfortable.

Defendant's only evidence that a military guard was placed outside her hospital room is contained in a psychiatric consult form which states, "military guard remains outside of patient room."  This report, however, is dated June 1, 2007.  There is no evidence that a military guard was stationed outside Defendant's room on May 31, 2007, when Agent Hoback's interview took place.  Further, there is no evidence that Defendant was ever aware of a military guard standing outside her room.  Therefore, this cannot be considered evidence of police coercion.

Even if the presence of four to six law enforcement agents is sufficient to establish objective police coercion, and assuming Defendant's physical and mental condition establishes that the police coercion "was sufficient to overbear the defendant's will," Defendant still has not established that this coercion "was the crucial motivating factor" in her decision to talk to the agents.  *Rutherford*, 555 F.3d at 195 (citation omitted).  There is no evidence that Defendant only spoke to the agents because of coercive conduct by the police.  *See McCall v. Dutton*, 863 F.2d 454, 461 (6th Cir. 1988).  By all accounts, Defendant was cooperative and willing to speak with the agents.  If Defendant's statements were "a product of [her] own incoherent state of mind, rather than a product of police coercion, [those statements] should not be suppressed."  *Id.*

Finally, the fact that Defendant was not read her *Miranda* rights is irrelevant.  As stated above, an accused is entitled to the reading of his or her *Miranda* rights only when he or she is

interrogated while "in custody." *Thompson v. Keohane*, 516 U.S. 99, 102 (1995). "The 'ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" *United States v. Swanson*, 341 F.3d 524, 529 (6th Cir. 2003) (quoting *United States v. Knox*, 839 F.2d 285, 291 (6th Cir. 1988)). Clearly, at the time Agent Hoback interviewed Defendant, she was not under formal arrest. Nor is it enough that Defendant was receiving treatment in a hospital to establish that Defendant was in custody. *See, e.g.*, *United States v. Martin*, 781 F.2d 671, 673 (9th Cir. 1985) (suspect was not in custody in a hospital where there was no evidence that "law enforcement officials were in any way involved in Martin's hospitalization or did anything to extend Martin's hospital stay and treatment.").

Agents did not restrain Defendant's movement; rather, she was restrained only by her medical treatment. Agents allowed other people in the room during the interview. Objectively, Defendant was not a suspect of any crime at the time of the interview. Instead, Agent Hoback testified that he routinely interviews those who were present at the scene of a fire when he is conducting an investigation of the cause and origin. There was no intent to arrest Defendant on May 31, 2007, nor was any such intention communicated to Defendant. The Court believes a reasonable person in Defendant's position would have felt free to terminate the interview. *See, e.g.*, *United States v. Phillip*, 948 F.2d 241, 247 (6th Cir. 1991). Because Defendant was not in custody on May 31, 2007, law enforcement agents were not required to advise her of her *Miranda* rights, and there is no Fifth Amendment violation.

B.     *June 6, 2007 Interview with Agent Thielhorn*

Agent Thielhorn's interview with Defendant on June 6, 2007, occurred after law

enforcement agents determined arson was the cause and origin of the fire. According to Agent Thielhorn, Defendant was considered a "person of interest" on June 6, 2007. Agent Thielhorn was accompanied by Agent Matt Cummings from Army CID.

The government provided a recording of the June 6, 2007, interview to the Court for review. The Court has listened to the recording and makes the following observations. First, Defendant appears eager to speak throughout the entire interview. She speaks clearly and definitively, and she is aware that the interview is being recorded. There is no indication that Defendant was disoriented. Further, Defendant states more than once during the interview that Agent Thielhorn can ask her anything he wants. At the end of the interview, Defendant states that no threats or promises were made by law enforcement officials, and her statement was given voluntarily.

In addressing whether Defendant's statements to Agent Thielhorn were voluntary, the Court uses the same analysis applied in the previous section of this opinion. Defendant must establish some evidence of police coercion. *Connelly*, 479 U.S. at 164. Again, no such evidence exists. Defendant was informed that the interview was tape recorded. There were only two agents present during this interview. The interview lasted less than two hours, and Defendant was allowed to speak to her nurse during this time. There is no evidence that an Army soldier was stationed outside the door on June 6, 2007. Moreover, Defendant was cooperative and offered information beyond that requested by Agent Thielhorn. Accordingly, the Court finds that Defendant's statements were voluntary.

In addition, Defendant was not "in custody" on June 6, 2007. Although she may have been as suspect at this time, she was not under formal arrest. Agents Thielhorn and Cummings

13

did nothing to physically restrain her movement, nor did they affect her treatment in any way. Defendant was not told she was under arrest or not free to leave. Other people were allowed to enter the room during the interview. The Court finds that a reasonable person in Defendant's position would have felt free to terminate the interview, and the agents were not required to advise Defendant of her *Miranda* rights.

Finding no Fifth Amendment violations occurred during the May 31, 2007, and June 6, 2007, hospital interviews, Defendant's motion to suppress these statements must be denied. Accordingly, Defendant's fruit of the poisonous tree argument must also fail.

## II.      Suppression of Evidence Taken from Defendant's Residence

After the fire at Defendant's home was suppressed, law enforcement agents conducted a cause and origin investigation. The investigation spanned nearly three days, from May 29, 2007, to May 31, 2007, until a certified accelerant detection dog alerted to the presence of accelerant in the home. After the detection dog alerted, law enforcement agents obtained consent to search the residence from both Defendant and her husband. Defendant now seeks to suppress all evidence obtained without a search warrant.

The Fourth Amendment was established to protect "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV*; see also Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). "The Fourth Amendment generally prohibits the warrantless entry of a person's home, whether to make an arrest or to search for specific objects." *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990). This prohibition does not apply when the individual whose home is searched has given consent. *Id.* (citing *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973)). Evidence obtained as a result of an

unlawful search and seizure may be excluded. "The exclusionary rule prohibits the admission of evidence seized in searches and seizures that are deemed unreasonable under the Fourth Amendment, as well as derivative evidence acquired as a result of an unlawful search." *United States v. Kennedy*, 61 F.3d 494, 497 (6th Cir. 1995) (citing *Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963)).

In this case, various items were seized prior to law enforcement agents seeking consent from Mr. and Mrs. Smallwood. According to law enforcement reports, the following items were seized on May 29, 2007, without a warrant: "arson debris," a smoke detector, foam from a couch cushion, a computer hard drive, a knife, a receptacle and electronic box, miscellaneous documents, a book, a twelve gage shotgun shell, a military flash grenade, a plastic bottle, an envelope and card, a pistol box, a cleaning brush, and a magazine. The knife, hard drive, shotgun shell, documents, and book were located on or in a desk that had been pulled out of the residence by firefighters in their attempts to suppress the fire. The Smallwoods' vehicle was also searched on May 29, 2007.

A.      *Items Seized from the Residence on May 29, 2007*

At no time during the investigation of the Smallwood residence did law enforcement agents obtain a warrant. "A warrantless search is *per se* unreasonable, and therefore prohibited by the Fourth Amendment, unless the facts of a particular case bring it within one of the specifically established exceptions to this rule." *United States v. Gargotto*, 476 F.2d 1009, 1012 (6th Cir. 1973). The government argues that one such exception applicable to this case is articulated in *Michigan v. Tyler*, 436 U.S. 499 (1978). Finding that a burning building presents "an exigency of sufficient proportions" to negate the warrant requirement, the Supreme Court

held that "an entry to fight a fire requires no warrant, and . . . once in the building, officials may remain there for a reasonable time to investigate the cause of the blaze." *Id.* at 509, 511. Officials in the building at this time may seize any evidence of arson in plain view. *Id.* at 509 (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 465-66 (1971)). "Thereafter, additional entries to investigate the cause of the fire must be made pursuant to the warrant procedures governing administrative searches." *Id.* at 511.

In *Tyler*, firefighters responded to a fire that started just before midnight on January 21, 1970. 436 U.S. at 501. At approximately 2:00 a.m., the fire chief arrived on the scene to determine the cause of the fire. *Id.* The fire chief and a police detective took pictures and removed two plastic containers of flammable liquid. *Id.* at 502. The fire was extinguished by 4:00 a.m. *Id.* Law enforcement officials had to abandon their search because of smoke and steam. *Id.* The fire chief returned approximately four hours later to continue the investigation. *Id.* At approximately 9:00 a.m., the police detective re-entered the scene and discovered suspicious burn marks. *Id.* Additional law enforcement agents entered the house on January 26 and 29, and February 16. *Id.* at 503.

A warrant was not required for the initial entry by the fire chief because "officials need no warrant to remain in a building for a reasonable time to investigate the cause of a blaze after it has been extinguished." *Id.* at 510. Additionally, the Supreme Court held that a warrant was not required for the early morning re-entries on January 22, as these entries "were no more than an actual continuation of the first . . . ." *Id.* at 511. The rationale behind allowing these warrantless entries is that prompt investigation serves two important purposes: (1) to prevent any recurrence of fire, such as from faulty wiring; and (2) "to preserve evidence from intentional or accidental

destruction." *Id.* at 510. The Supreme Court found that the entries occurring after January 22 were invalid because they were too detached from any exigent circumstances. *See id.* at 511. "[A]dditional entries to investigate the cause of the fire must be made pursuant to the warrant procedures governing administrative searches." *Id.* (citations omitted).

The Supreme Court addressed a similar case in *Michigan v. Clifford*, 464 U.S. 287 (1984). In that case, a fire occurring in the early morning hours was extinguished by approximately 7:00 a.m., at which point all officials left the premises. *Id.* at 289-90. A fire investigator arrived on the scene at approximately 1:00 p.m. the same day. *Id.* He observed a work crew, sent by the homeowners' insurance company, boarding up the house and pumping water out of the basement. *Id.* The fire investigator and his partner entered and searched the residence without consent or a warrant. *Id.* at 290-91. Acknowledging the lack of exigent circumstances at the time of the fire investigator's entry, the government instead asked the Supreme Court to "exempt from the warrant requirement all administrative investigations into the cause and origin of a fire." *Id.* at 291. The Supreme Court declined. *Id.* "Where . . . reasonable expectations of privacy remain in the fire-damaged property, additional investigations begun after the fire has been extinguished and fire and police officials have left the scene, generally must be made pursuant to a warrant or the identification of some new exigency." *Id.* at 293.

In light of this precedent, the Court finds that some of the evidence obtained by law enforcement agents on May 29, 2007, is admissible. In this case, the fire occurred at approximately 2:15 a.m. Firefighters responded to the call and worked to rescue the occupants of the home and subdue the fire. At approximately 7:00 a.m., law enforcement agents entered

the home to investigate the cause of the fire. This warrantless entry is permissible under *Tyler*,

as it occurred within a reasonable time from the suppression of the fire, for purposes of

investigating cause and origin. 436 U.S. at 511. Although it appears the fire investigator exited

the residence at approximately 11:50 a.m., he returned to the home at 1:00 p.m. This re-entry

was "no more than an actual continuation of the first" entry, and therefore, no warrant was

required. *Id.*

Finding the warrantless entries on May 29, 2007, to be lawful, the Court finds that the

"arson debris," smoke detector, couch cushion foam, electrical outlet, and plastic bottle obtained

from the residence on that day are admissible. Once lawfully inside the residence, *Tyler* grants

law enforcement officials the right to seize evidence of arson that is in plain view. *Id.* at 509.

These pieces of evidence are clearly related to the agents' investigation and were in plain view:

> The plain view doctrine must be applied in light of the special circumstances that
> frequently accompany fire damage. In searching solely to ascertain the cause,
> firemen customarily must remove rubble or search other areas where the cause of
> fires are likely to be found. An object that comes into view during such a search
> may be preserved without a warrant.

*Clifford*, 464 U.S. at 295 n. 6. The Supreme Court in *Clifford* also implied that any evidence of

criminal activity in plain view may be seized during an exigent circumstances entry, not just

those items relating to arson. *See id.* at 294 ("A search to gather evidence of criminal activity

*not in plain view* must be made pursuant to a criminal warrant upon a traditional showing of

probable cause." (emphasis added)). Therefore, the knife is also admissible. Agents were aware

that the tires on the Smallwoods' car had been slashed prior to entering the residence. It was

"immediately apparent to the [agents] that they [had] evidence before them" at the time they

seized the knife. *Coolidge v. New Hampshire*, 403 U.S. 443, 466 (1971) (plurality opinion).

The plain view doctrine may not, however, "be used to extend a general exploratory search from one object to another until something incriminating at last emerges." *Id.* Accordingly, the hard drive, documents, book, shotgun shell, grenade, envelope, pistol box, cleaning brush, and magazine are inadmissible as there is nothing linking these items to the arson or any other suspected criminal activity.[1] Although Agent Wojner testified that the hard drive might have revealed harassing communications to the family, one cannot conclude that a hard drive contains incriminating evidence just by looking at it. Further, as Mr. Smallwood is a member of the Army, his ownership of a military flash grenade, shotgun shell, magazine, and pistol box is not unusual. The government has failed to establish that any of the remaining items were evidence of arson, other than that these items were "scorched" by the fire.

B.      *Items Seized from the Residence After May 29, 2007*

In contrast, entries into the residence after May 29, 2007, required a warrant or consent. Testimony indicates that the house was secured by Army CID on May 29, 2007, following the initial investigation. Army CID boarded the windows and doors, and secured the scene overnight using military police. Therefore, no exigent circumstances remained on May 30 or 31, and the *Tyler* exception does not apply.

Consequently, the Court is troubled by the warrantless entry with the accelerant detection dog on May 31, 2007. The dog's alert constitutes evidence obtained as a result of an unlawful search. Because law enforcement agents failed to obtain an administrative warrant prior to

---

[1]The fact that some of these items had been pulled outside onto the front lawn by firefighters is irrelevant, as Fourth Amendment protection extends to the curtilage of the home. *See, e.g.*, *Hardesty v. Hamburg Twp.*, 461 F.3d 646, 652 (6th Cir. 2006) (quoting *United States v. Dunn*, 480 U.S. 294, 300 (1987)).

entering the Smallwood residence with the accelerant detection dog, evidence of the dog's presence and alert to accelerant in the home must be suppressed.

After the dog alerted to the presence of accelerant, law enforcement agents decided to attempt to obtain consent from Mr. and Mrs. Smallwood to search their home. Both parties signed written consent forms agreeing to the search of the residence. These consents are invalid if they are considered fruit of the poisonous tree stemming from the illegal entry with the dog. "'[S]uppression is required of any items seized during the search of the house, unless the taint of the initial entry has been dissipated before the 'consents' to search were given.'" *United States v. Buchanan*, 904 F.2d 349, 356 (6th Cir. 1990) (quoting *United States v. Vasquez*, 638 F.2d 507, 527 (2d Cir. 1980)); *see also United States v. Chambers*, 395 F.3d 563, 569-70 (6th Cir. 2005). In order to dissipate the effects of the taint of the illegal entry, the government must generally show "'some significant intervening time, space, or event.'" *Buchanan*, 904 F.2d at 356 (quoting *Vasquez*, 638 F.2d at 528). A party's consent must be "'*sufficiently* an act of free will to purge the primary taint of the unlawful invasion.'" *Id.* (quoting *Brown v. Illinois*, 422 U.S. 590, 599 (1975) (emphasis in original)).

In this case, the evidence demonstrates that the taint of the illegal entry with the dog was dissipated at the time law enforcement agents obtained consent from Mr. and Mrs. Smallwood. Two agents were sent to speak with Mr. Smallwood, and two agents were sent to Mrs. Smallwood. Of these four agents, only one testified to being involved in the prior arson investigation. This agent played a minor role and had no knowledge of any agents entering the residence prior to seeking consent. Nor were Mr. and Mrs. Smallwood ever made aware of the dog's alert to the presence of accelerant. Therefore, there is no reason to believe consent was

given by the Smallwoods because they knew agents had already entered the residence that day and refusing consent would be futile. *See, e.g.*, *Chambers*, 395 F.3d at 570. Because the agents were not part of the initial investigation and the Smallwoods were not present and had no knowledge of the illegal search, the Court finds that the taint of the illegal entry was dissipated.

In addition, the evidence demonstrates that consent was valid. Agents did not need consent from both Mr. and Mrs. Smallwood in order for consent from one to be valid. "The Fourth Amendment recognizes a valid warrantless entry and search of premises when police obtain the voluntary consent of an occupant who shares, or is reasonably believed to share, authority over the area in common with a co-occupant who later objects to the use of evidence so obtained." *Georgia v. Randolph*, 547 U.S. 103, 106 (2006) (citing *Illinois v. Rodriguez*, 497 U.S. 177 (1990); *United States v. Matlock*, 415 U.S. 164 (1974)); *accord United States v. Hinojosa*, 606 F.3d 875, 881 (6th Cir. 2010) ("It is well settled that valid consent may be given by a third party with common authority over the premises."). However, the Supreme Court ruled in *Randolph* that if a co-occupant is on the scene and refuses consent, "a physically present co-occupant's stated refusal to permit entry prevails, rendering the warrantless search unreasonable and invalid as to him." 547 U.S. at 106. Because neither of the Smallwoods were present at the time law enforcement officers sought consent, *Randolph* is inapplicable.

Consent is considered valid if it was given voluntarily. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 224 (1973); *United States v. Worley*, 193 F.3d 380, 384 (6th Cir. 1999). "The determination of whether consent was valid is a fact-specific inquiry that must be determined by the totality of the circumstances." *Worley*, 193 F.3d at 386 (citation omitted), *see also Hinojosa*, 606 F.3d at 881. Consent may not be "coerced, by explicit or implicit means, by implied threat

or covert force." *Schneckloth*, 412 U.S. at 228. The Court may consider "'the age, intelligence, and education of the individual; whether the individual understands the right to refuse to consent; whether the individual understands his or her constitutional rights; the length and nature of detention; and the use of coercive or punishing conduct by the police.'" *Worley*, 193 F.3d at 386 (quoting *United States v. Riascos-Suarez*, 73 F.3d 616, 625 (6th Cir. 1996) *overruled on other grounds by Muscarello v. United States*, 524 U.S. 125 (1998)). Although it is a factor to be considered, it is not essential that the government demonstrate consent was given with knowledge of the right to refuse consent. *Schneckloth*, 412 U.S. at 234.

In this case, there is no evidence of threats or coercion by law enforcement agents. Further, both Mr. and Mrs. Smallwood were coherent and cooperative at the time they gave consent. Both were advised of their right to refuse consent, and neither encounter lasted longer than thirty minutes. Accordingly, the Court finds that consent was valid. Any evidence obtained from the residence after the Smallwoods gave consent on May 31, 2007, is admissible.

### III. Suppression of Rape Kit and Search of the Vehicle

Following the death of the Smallwoods' daughter, law enforcement officials asked the medical examiner to do a rape kit on her. Agent Wojner was suspicious of Mr. Smallwood's relationship with his daughter, and wanted to preserve any evidence of wrongdoing. Agent Wojner described it as "nothing more than acting on a hunch." The parties have indicated to the Court that there is no challenge as to the admissibility of the rape kit.

The search of the Smallwoods' vehicle occurred on May 29, 2007. Agent Wojnak stated that the vehicle had been "scratched up," the tires were flattened, and there were words written on the car. A bomb squad was called to search the vehicle because the vehicle appeared

suspicious and the trunk was ajar, although Mr. Smallwood told agents that the vehicle was

undamaged and secured when he parked it the previous evening. The government informed the

Court that no evidence was retrieved from inside the vehicle. Accordingly, there is no

suppression issue as to the search of the vehicle's interior. Nor is there an issue as to the

examination of the exterior of the vehicle. The Smallwoods' vehicle was clearly vandalized and

the tires were ruptured. "[W]here probable cause exists, a warrantless examination of the

exterior of a car is not unreasonable under the Fourth and Fourteenth Amendments." *Cardwell v.*

*Lewis*, 417 U.S. 583, 592 (1974) (allowing police officers to examine a tire and take paint

scrapings from the exterior of a vehicle without a warrant).

## CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED that Defendant's Motion to

Suppress is GRANTED IN PART and DENIED IN PART.