# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
### PADUCAH DIVISION
### CASE NO. 5:08-CR-38

UNITED STATES OF AMERICA                                    PLAINTIFF

v.

BILLI JO SMALLWOOD                                          DEFENDANT

## MEMORANDUM OPINION AND ORDER

This matter is before the Court upon Defendant's Motion for Daubert Hearing and to Exclude Testimony (Docket #84) and the government's Motion to Exclude Testimony of Defense Expert Witnesses (Docket #83). A Daubert hearing was held in this matter on August 24, 26, 27 and 30, 2010. The parties have filed supplemental briefs (Docket #112, 113). This matter is now ripe for adjudication.

## BACKGROUND

This case arises from a fire that occurred on May 29, 2007, at the Fort Campbell, Kentucky, U.S. Army base. Defendant Billi Jo Smallwood resided at 4137 Dixie Road, unit D, with her husband, Wayne Smallwood, and three minor children. In the early morning hours of May 29, 2007, neighbors reported the Smallwood residence was on fire to the Fort Campbell Fire Department. Upon arrival, the firefighters discovered Billi Jo and Wayne Smallwood, with their youngest child, outside the residence. The other two children were still in the house. Firefighters attempted to rescue the two children, but neither survived. Billi Jo Smallwood was transported to Vanderbilt Medical Center for treatment of severe burns she received during the fire. Mrs. Smallwood sustained second degree burns to the fronts of both legs, from her knees to her feet, and her right forearm.

While assessing the fire scene, Special Agent Amber Wojner of Army CID noticed that the

Smallwoods' car had been vandalized. The tires had been flattened and there were words written on the exterior of the vehicle. A knife was located on a desk pulled from the Smallwoods' home by firefighters. Law enforcement agents seized the knife along with various other items of evidence on May 29, 2007.

Mrs. Smallwood was indicted on November 13, 2008, for malicious damage and destruction by fire to property owned by the United States and malicious damage and destruction by fire to property owned by the United States resulting in deaths. She was arrested on November 18, 2008. The government filed a superseeding indictment on September 22, 2010. This case is now set for trial on October 18, 2010. Defendant seeks to exclude the testimony of government experts Dr. John DeHaan and Ms. Kristin Gerber. The government seeks to exclude the testimony of Mr. Doug Carpenter.

## STANDARD

Under Federal Rule of Evidence 702, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Rule 702 was amended in 2000 to address the Supreme Court's seminal opinion of *Daubert v. Merrill Dow Pharm., Inc.*, 509 U.S. 579 (1993), and its progeny, including *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999). *See* Fed. R. Evid. 702, Advisory Committee Notes. To determine reliability, a court can look at factors "such as testing, peer review, error rates, and "acceptability" in the relevant scientific

community[.]" *Kumho Tires*, 526 U.S. at 141.

"As a gatekeeper, the trial judge has discretion in determining whether a proposed expert's testimony is admissible based on whether the testimony is both relevant and reliable." *Rose v. Truck Centers, Inc.*, No. 09-3597, 2010 WL 3069613, at *4 (6th Cir. Aug. 6, 2010) (citing *Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 429 (6th Cir. 2007); *Daubert*, 509 U.S. at 589). The trial judge must assess "whether the reasoning of methodology underlying the testimony is scientifically valid and [ ] whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93.

## DISCUSSION

### I. John DeHaan

Government expert John DeHaan intends to testify that Defendant's burns were inconsistent with her version of the events. Instead, DeHaan will testify that Defendant's burns "were entirely consistent with those produced when someone ignites the vapors of gasoline or a similar ignitable liquid on a floor by application of an open flame." In preparing his opinion, DeHaan reviewed investigative files, interviews, medical records, photographs, and other investigative reports from this case. He also visited the Smallwood residence in February of 2008.

Defendant objects specifically to the following opinions DeHaan intends to offer:

1. The burns to Defendant were not the result of being on the stairs of the structure and being chased by the flames as they extended up the stairs;

2. The burns were not the result of exposure to heat or flames after her escape;

3. The burns to Defendant were entirely consistent with those produced when someone ignites the vapors of gasoline or a similar ignitable liquid on a floor by application of an open flame;

4. The smoke detectors in the dwelling were intentionally removed before the

fire;

5.	The appearance of burns to lower extremities (fronts), one or both forearms (forward or inside), or hands and the face is observed most often when the burn victim has been responsible for actually igniting a volume of flammable gas or vapor with a hand-held source such as a match, lighter or candle;

6.	And any other analysis or opinion by Dr. DeHaan which attempts to link Defendant to being the person who set the fire.

As a preliminary matter, the Court finds DeHaan qualified to testify as an expert on this matter. DeHaan obtained his Bachelor of Science in Physics from the University of Illinois - Chicago Circle in 1969. In 1995, he earned his Ph.D. in Pure and Applied Chemistry (Forensic Science), at Strathclyde University in Glasgow, Scotland. DeHaan has extensive experience (approximately 37 years) in the area of fire and explosives. He is a member of various fire and forensic associations, has authored or co-authored several publications on the subject of fire investigations, and has testified as an expert in numerous trials.

The parties do not dispute that DeHaan's opinions are relevant. Defendant is charged with malicious damage and destruction by fire to property owned by the United States. Neither party disputes that the cause of the fire was arson. Therefore, DeHaan's opinions as to who committed the arson are clearly relevant.

The true point of contention in regard to DeHaan's testimony is whether his opinion is reliable. The Supreme Court, in *Daubert*, provided a non-exclusive list of factors for trial courts to consider in evaluating reliability. *Daubert*, 509 U.S. at 593-594. These factors include: "testing, peer review, publication, error rates, the existence and maintenance of standards controlling the technique's operation and general acceptance in the scientific community." *In re Scrap Metal Antitrust Litig.*, 527 F.3d, 517, 529 (6th Cir. 2008) (citing *United States v. Langan*, 263 F.3d 613,

621 (6th Cir. 2001)). The test of reliability, however, is a flexible one. *Id.* "A court must be sure not 'to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other.'" *Id.* Reliability instead means "an expert's testimony . . . must be 'supported by appropriate validation –i.e., 'good grounds,' based on what is known." *Id.* (citing *Daubert*, 509 U.S. at 590). "The task for the district court in deciding whether an expert's opinion is reliable is not to determine whether it is correct, but rather to determine whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation." *Id.* at 529-30.

The Court considers each of Defendant's objections separately.

A.      *DeHaan's opinion that the burns to Defendant were not the result of being on the stairs of the structure and being chased by the flames as they extended up the stairs*

DeHaan testified that, based on his review of the case, Defendant's primary burns were on the fronts of both her right and left legs from the knees to the feet. Her injuries were second-degree burns. Defendant's toes and heel appear to have been protected by a pull-on slipper on each foot. DeHaan also testified that a burn was reported on the outside of her right forearm, although this was not documented by photographs. Defendant had soot on her face, but no burns. Based on her injuries, DeHaan concluded that "[t]he distribution of burn damage to the fronts of legs are what you would expect from actually the simple physics of a heat source being at low level and radiant heat from that heat source striking the nearest facing surface of the skin and inducing damage . . . where that radiant heat can strike." Daubert Transcript, DN 101, p. 1-14.

DeHaan went on to add that Defendant's burns could not have resulted from her presence on the stairs of the structure because a solid side wall would have prevented radiant heat from striking her legs. "In fact, if she's down far enough on that stairway that she's going to be receiving

5

any heat, she's going to be getting radiant heat basically from the waist up, because from the waist down, there's a solid wall protecting her." DN 101, p. 1-18. Based on this logic, DeHaan concluded that Defendant must have been on the landing of the stairway or on the floor of the living room.

DeHaan is certainly permitted to testify as to his knowledge of radiant heat and the characteristics of the fire, as these conclusions are based upon a sufficient foundation of experience and literature. In addition, DeHaan's opinion that Defendant could not have been located on the stairs at the time she received her burns shall not be excluded. DeHaan visited the Smallwood residence and observed the wall that separates the stairwell from the living room. Applying his knowledge of radiant heat to the circumstances described by Defendant and the geometric layout of the residence, DeHaan reached his opinion that Defendant could not have been on the stairwell at the time she received the burns on her legs. This conclusion is supported by sound reasoning, DeHaan's personal observations, and studies on the effects of radiant heat on surfaces.

> B.     *DeHaan's opinion that Defendant's burns were not the result of exposure to heat or flames after her escape*

Next, Defendant seeks to exclude DeHaan's opinion that Defendant's burns could not have been the result of exposure to the fire after her escape. DeHaan stated in his testimony before the Court that he "assessed the distribution of burns and various sources of burn injuries after she retreated up the stairs and attempted to make her escape from the rear porch overhang, and those burns were not consistent with those events . . . ." Daubert Transcript, DN 101, p. 1-12. DeHaan's report explains in more detail:

> Mrs. Smallwood reportedly was chased up the stairs by a fire rapidly advancing across the floor and up the stairs. Had this occurred, the predominant burns would have been to the "backs" of her legs, not to the front areas, and would not have burned the tops of both feet. While awaiting rescue, she reportedly had her legs

extended over the edge of the patio roof. The heat and smoke damage above the windows under that roof indicated only modest emission of hot gases. The patio roof was also steeply pitched downward and ran continuously the length of the six-unit block. There would not have been sufficient heat flowing outward from under the roof eave (as a balcony plume) to induce injury to exposed skin. In any event, such injury would have been incurred on the backs of the legs, not the front. Mrs. Smallwood also claimed she attempted re-entry through the bedroom window from which she escaped but was driven back by the smoke and heat. While such exposure could account for the first degree burns on her face, neck and chest, the heat would be accompanied by intense smoke. Very little smoke was observed on her when she was rescued, and there were no reports of breathing difficulties detected during emergency room treatment.

DeHaan Preliminary Report, US-000612 (attached as Exhibit 1). DeHaan's opinion is based upon Defendant's version of the events of May 29, 2007.

The Court finds that DeHaan's opinions as to whether Defendant could have received the burns on her legs from (1) being chased up the stairs, (2) extending her legs over the patio roof, and (3) attempting re-entry of the home through the bedroom window are improper expert opinions and shall be excluded. The Court believes DeHaan's opinions as to Defendant's escape are too speculative in regards to Defendant's actions and the progression of the fire. DeHaan presented no scientific analysis as to how the fire would have progressed after ignition in the living room as far as traveling up the stairs, down a hall, and into the bedrooms. In addition, he failed to point out any of his own experiments or other studies regarding heat levels, smoke inhalation, and the timing of fires. As DeHaan's conclusions are unsupported, the Court believes they lack sufficient reliability.

C.    *DeHaan's opinion that Defendant's burns were entirely consistent with those produced when someone ignites the vapors of gasoline or a similar ignitable liquid on a floor by application of an open flame*

DeHaan intends to offer his opinion that Defendant's burns are consistent with those produced when someone ignites the vapors of gasoline by application of an open flame. Defendant

objects to this conclusion because there is no valid, scientific basis for DeHaan's opinion. In addition, Defendant notes that the lack of systematic studies on the burns sustained by people igniting a fire prevents the Court from finding that DeHaan's proffered opinion is reliable.

First, DeHaan's report indicates that "[s]econd and third degree burns to the lower extremities are commonly observed when a person is standing near or walking through vapors of flammable liquid as they burn." DeHaan's Preliminary Report, US-000612 (attached as Exhibit 1). DeHaan also notes that burns predominantly on one side of an extremity are common when a person is facing a fire rather than walking through it. While both of these statements are admissible on their own, neither statement supports the conclusion that Defendant ignited the fire.

According to DeHaan's testimony, one of the sources he relied on titled "The Morphology of Cutaneous Burn Injuries" by Fracasso looked at patients' burns after exposure to deflagrations. In that study, patients obtained burns to the face and hands, but the paper does not address any injuries to the legs. That paper also acknowledged the lack of systematic studies in the area of the morphology of cutaneous burns. DeHaan noted that the literature "is very limited and especially when it comes to people setting fires, because they tend not to be identified in especially the medical literature." Daubert Transcript, DN 101, p. 1-27. Fracasso's paper referenced another paper by Mark Bohnert which looked at five case studies of people who had started fires. The subjects suffered singed hair and burns to the forehead, nose, cheeks, hair, temporal region, and fingertips. Although DeHaan did not recall this paper, he acknowledged that he had read it and cited it as a reference in one of his books.

In DeHaan's own writings, he notes that victims of fires sometimes suffer no significant antemortem damage. In addition, he states that "[a] person who represents the ignition source,

however . . . is much less likely to be injured because the flames move rapidly away from the source. This person will often escape any injury, especially where there is a layer of fuel vapor/air involved." Daubert Transcript, DN 101, p. 1-34. DeHaan clarified that "less likely" was an important part of that statement, and noted that the energy of the flame around that ignition source would be less intense.

DeHaan's report states that burns to the fronts of lower extremities, one or both forearms or hands, and the face are "observed most often when the burn victim has been responsible for actually igniting a volume of flammable gas or vapor with a hand-held source such as a match, lighter or candle." DeHaan Preliminary Report, US-000612 (attached as Exhibit 1). However, neither his report nor his testimony offers any support for these conclusions. In addition, the texts DeHaan relied upon in formulating his opinion provide little, if any, support. In some cases, the literature and DeHaan's own studies appear to contradict his opinion. For instance, DeHaan's own research acknowledges that there is a lack of reliable data as to second-degree burns from thermal radiation. Moreover, DeHaan fails to point to any studies that demonstrate second-degree burns on the front lower extremities of a person who served as the ignition source of a fire. In fact, some of DeHaan's own research shows little or no harm caused to the person responsible for igniting the fire since the flame front moves outward, away from the ignition source.

The government argues that DeHaan's opinion is proper because his opinions are supported by his education, training, and experience. The Court has already acknowledged that DeHaan is qualified to testify as an expert in this case. Additionally, the Court notes that DeHaan's experience in the field is extensive. As noted above, DeHaan shall be allowed to testify to the following, as stated in his preliminary report:

> Second and third degree burns to the lower extremities are commonly observed when a person is standing near or walking through vapors of flammable liquids as they burn. The radiant heat (and convected heat if actual flame contact occurs) can induce second degree skin burns (sloughing of skin, blistering) within 3-4 seconds of exposure. The appearance of third degree burns usually requires a longer time of contact (5 seconds or longer). The presence of such burns predominantly only on one side (i,e., not circumferential – not all the way around the leg) is observed when the person is facing the fire rather than walking through it.

DeHaan Preliminary Report, US-000612 (attached as Exhibit 1). However, DeHaan's particular opinion as to Defendant's burns being consistent with those of someone who ignited a fire remains unsupported and therefore, unreliable. Because of this, any opinion offered by DeHaan which states that Defendant's burns are consistent with those produced when someone ignites the vapors of gasoline or a similar ignitable liquid on a floor by application of an open flame must be excluded. This includes the portion of his report which states:

> The appearance of burns to lower extremities (fronts), one or both forearms (forward of inside) or hands and the face is observed most often when the burn victim has been responsible for actually igniting a volume of flammable gas or vapor with a hand-held source such as a match, lighter or candle.

DeHaan Preliminary Report, US-000612 (attached as Exhibit 1). In other words, DeHaan lacks a reliable scientific foundation to affirmatively state that Defendant's burns are consistent with her being the one who set the fire.

> D.     *DeHaan's opinion that the smoke detectors in the dwelling were intentionally removed before the fire*

DeHaan's report states as follows in regards to the smoke detectors located in the Smallwood residence:

> The unit was reportedly fitted with two hard-wired smoke detectors (unknown type). The mounting plates and wires for both were found during scene examination, but the dining room unit was found disconnected and placed on the child's high chair. The second unit was never found. Such units, if in place during a fire, will usually

> have the melted plastic housing adhering to the wires. These findings strongly
> suggest that both units were removed intentionally before the fire.

DeHaan Preliminary Report, US-000613 (attached as Exhibit 1). It appears to the Court that neither

party challenges the location of the smoke detectors following the fire. Rather, the parties seem to

dispute the intent of the removal of the smoke detectors. Any opinion as to the motive behind

removing the smoke detectors is purely speculation on the part of either DeHaan or defense expert

Doug Carpenter. In addition, DeHaan's opinion that the smoke detectors were intentionally

removed before the fire implies guilt, and is therefore unduly prejudicial given the lack of evidence

as to the reasons for removal. Therefore, this opinion testimony shall be excluded as it is

speculation, prejudicial, and will not assist the trier of fact.

> E.      *DeHaan's opinion that the appearance of burns to lower extremities (fronts), one or*
>         *both forearms (forward or inside) or hands and the face is observed most often when*
>         *the burn victim has been responsible for actually igniting a volume of flammable gas*
>         *or vapor with a hand-held source such as a match, lighter or candle*

The opinion offered under this section is similar to that addressed in section C. The Court

addressed the lack of reliability for such conclusions in that section, and finds that this opinion must

also be excluded to the same extent detailed in section C.

> F.      *Any other analysis or opinion by DeHaan which attempts to link Defendant to being*
>         *the person who set the fire*

Finally, Defendant asks the Court to exclude any other opinions offered by DeHaan which

link Defendant to being the person who set the fire. The Court finds that this request is too vague.

Nor does the Court perceive any other opinions of this sort which DeHaan intends to offer at trial.

The Court notes that it instructed the parties on several occasions to make objections with

specificity.

## II. Doug Carpenter

Defense expert Doug Carpenter intends to refute DeHaan's findings by testifying that the burns to Defendant's lower legs are entirely consistent with her story that she was located on the stairs at the time she received these injuries. The government specifically seeks exclusion of Carpenter's opinions on the following:

1. The burns to Defendant's lower legs are totally inconsistent with the hypothesis that she was in the living room at the time of the fire's ignition, requiring her to walk through the fire in the living room to reach the stairs to the second floor, which would have produced circumferential burns;

2. The Defendant's thermal injuries to her upper body (including her forearm, upper chest, face and singed hair) are entirely consistent with the hypothesis that she was attempting to rescue her children once she was on the lower roof of the apartment building and trying to regain entrance to the apartment through a second story window;

3. The time frame for the Defendant's observation of the initial fire is entirely consistent with hearing noise caused by a person introducing ignitable liquid into the first floor of the Smallwood's apartment and giving her time to react to the sound and get down the stairs to witness the rapidly advancing blue flame across the living room floor towards the stairs;

4. That there is no evidence Defendant manufactured evidence in this case, including causing damage to the Smallwood vehicle;

5. And that the intentional removal of smoke detectors is a frequent and perennial problem identified by the fire protection community since the introduction of smoke detectors in the residential setting.

The Court finds Carpenter qualified to testify as an expert in this matter. Carpenter received his Associate in Science in Mechanical Engineering from Vermont Technical College in 1984. In 1992, he earned his Bachelor of Science in Mechanical Engineering from the University of Vermont. He also received his Master of Science in Fire Protection Engineering from Worcester Polytechnic

Institute in 1996. Since 1998, Carpenter has been a principal engineer for Combustion Science & Engineering, Inc., through which he is responsible for fire investigations, fire reconstruction analyses, and fire hazard analyses. He is a Certified Fire and Explosion Investigator through the National Association of Fire Investigators, a member of several professional fire safety and protection associations, and has published several articles on fire hazards and fire models.

Similarly to DeHaan, neither party argues that Carpenter's opinions are not relevant. Instead, the government objects to each of the opinions listed above because they are speculative and argumentative, rather than expert opinion. Carpenter did not testify at the Daubert hearing. The only evidence as to Carpenter's opinion before the Court is what appears to be a letter written by defense counsel to government counsel detailing what Carpenter's testimony will contain (attached as Exhibit 2). The Court will address each challenged opinion separately.

A.   *Carpenter's opinion that the burns to Defendant's lower legs are totally inconsistent with the hypothesis that she was in the living room at the time of the fire's ignition, requiring her to walk through the fire in the living room to reach the stairs to the second floor, which would have produced circumferential burns*

In support of this opinion, Carpenter is expected to testify that because Defendant was observed by eyewitnesses in the upstairs hallway and on the lower roof off of the second floor, she could not have been located in the living room at the time of the fire's ignition. This is because "she would have had to traverse or 'walk through' the fire in the living room and bottom of the stairs to reach the second floor." Carpenter Letter, p. 2 (attached as Exhibit 2). According to Carpenter, such a path would have produced circumferential burns around her entire legs.

Carpenter's opinion serves as a clear rebuttal to DeHaan's opinion that Defendant was in the

living room at the time the fire began.  The Court believes that allowing any expert opinion as to

Defendant's location is already a close decision in terms of admissibility.  However, since the Court

will allow DeHaan to present expert opinion on this subject, Carpenter shall be permitted to offer

his opinion as well.  The Court has found that Carpenter is qualified to testify as to the

characteristics of fire, and his opinion is based on facts contained in the record, so the Court will not

exclude this rebuttal evidence.  The Court does not believe it is too speculative or argumentative.

Rather, Carpenter's opinion is a reasoned response to DeHaan's opinion.

> **B.**     *Carpenter's opinion that Defendant's thermal injuries to her upper body (including*
> *her forearm, upper chest, face and singed hair) are entirely consistent with the*
> *hypothesis that she was attempting to rescue her children once she was on the lower*
> *roof of the apartment building and trying to regain entrance to the apartment*
> *through a second story window*

The government seeks to exclude Carpenter's opinion because it is too speculative. Carpenter

bases his opinion regarding Defendant's rescue attempts on the following reasoning:

> Billi Jo Smallwood's thermal injuries to her upper body including her forearm, upper
> chest, face and singed hair received during the fire incident of May 29, 2007, are
> entirely consistent with the hypothesis that she was trying to rescue her children once
> she was on the lower roof of the apartment building and trying to regain entrance to the
> apartment through a second story window.  Billi Jo Smallwood was holding her
> youngest child while on the lower roof and since she was right-handed, she would
> have carried the baby in her left arm and used her right arm to attempt to reenter the
> apartment from the lower roof through a second story window.  In addition, the soot
> on her face, but not in her airway, thermal injuries to her upper body, and singed hair
> is also entirely consistent with this action since she would naturally hold her breath
> when she put her head close to or through the window and exposing her face to hot,
> sooty smoke produced by the fire within the apartment, but not breathing in soot
> laden smoke.

Carpenter Letter, p. 2 (emphasis in original) (attached as Exhibit 2).  The Court agrees with the

government that this reasoning is too speculative and does not provide a proper expert opinion. Carpenter may not speculate as to how Defendant "would have carried the baby" or that Defendant "would naturally hold her breath." Accordingly, this opinion must be excluded.

C. *Carpenter's opinion that the time frame for Defendant's observation of the initial fire is entirely consistent with hearing noise caused by a person introducing ignitable liquid into the first floor of the Smallwood's apartment and giving her time to react to the sound and get down the stairs to witness the rapidly advancing blue flame across the living room floor towards the stairs*

The letter detailing Carpenter's opinions provides no support or reasoning for his opinion regarding the amount of time between Defendant hearing someone introducing ignitable liquid on the first floor and Defendant's observation of a blue flame rapidly advancing across the floor towards the stairs. It is clear to the Court that this opinion is far too speculative to be considered an expert opinion. Accordingly, it must be excluded.

D. *Carpenter's opinion that there is no evidence Defendant manufactured evidence in this case, including causing damage to the Smallwood vehicle*

Again, there is no supporting reasoning or evidence in regards to Carpenter's opinion that no evidence exists to show that Defendant manufactured evidence in this case. This appears to be pure speculation on the part of Carpenter. In addition, the existence or non-existence of evidence is not a proper basis for an expert opinion. Accordingly, this opinion must be excluded.

E. *Carpenter's opinion that the intentional removal of smoke detectors is a frequent and perennial problem identified by the fire protection community since the introduction of smoke detectors in the residential setting*

Carpenter is expected to testify that the Smallwoods had previously experienced "false alarms" from their smoke detectors, which is consistent with the removal of the smoke detectors. Like DeHaan's opinion as to the smoke detectors, this is speculation, and this opinion will be excluded.

## III.    Ms. Kristin Gerber

The government offers Gerber as an expert witness.  At trial, Gerber would testify that the knife found inside the house created test tool marks[1] that matched tool marks found in the tires on the vandalized vehicle.  Accordingly, Gerber would testify that, to a reasonable degree of scientific certainty, the knife found inside the home was the knife that slashed the tires in question.

The Defense, however, vigorously contests this testimony.  Two experts testifying for the defense attacked the underlying scientific reliability of tool mark testimony; however, neither were tool mark examiners so they were unable to contest the specifics of this particular identification. In contesting the underlying science, the defense witnesses contend that tool mark identification is not even science at all, but rather is a subjective, unreliable determination that can vary from examiner to examiner.  The witnesses also contend that the studies done on knife identification are fraught with error and bias, which undermines any purported testing, peer review and error rates propounded by the government.

According to The Association of Firearm and Tool Mark Examiners ("AFTE"), a match is determined if a "specific set of [tool marks]" demonstrates "sufficient agreement" in "the pattern of two sets of marks." *See* National Research Council of the National Academies, *Strengthening*

---

[1] While this Court realizes that the "Tool Mark Identification" field encompasses firearms and tools, for the purposes of this opinion 'tool marks' will refer to non-firearm related marks such as those made by knives, screw drivers and the like.

*Forensic Science in the United States: A Path Forward* (2009) (hereinafter "*Strengthening*"), pg. 153. Sufficient agreement must "exceed the best agreement demonstrated between tool marks known to have been produced by different tools and [be] consistent with the agreement demonstrated by tool marks known to have been produced by the same tool." *Id.* "AFTE standards acknowledge that these decisions involve subjective qualitative judgments . . . and that the accuracy of examiners' assessments is *highly dependant* on their skill and training." *Id.* (emphasis added). "The examiner is expected to draw on his or her own experience." *Id.* at 155. Even with new technology, "the decision of the [tool mark] examiner remains a subjective decision based on unarticulated standards[.]" *Id.* at 153-54.

By AFTE's own standard, there is no reliability in the instant case. While Gerber is most likely an expert in firearm identification, that expertise cannot be transferred to other marks. Gerber testified that her training in knives was limited to one class that did not solely cover knives, but rather "covered an array of different tools and marks." DN. 102, pg. 2-65. Gerber had only looked at knife marks in tires on one occasion prior to this case, during her aforementioned class. *Id.* at 2-68. By her own testimony, Gerber acknowledged that knife cases are rare in her lab, and that she has never testified in a knife case before. *Id.* at 2-49. Accordingly, Gerber does not have the skill and training in knives that she has in other identifications, the same skill and training on which the "accuracy of [an examiner's assessment] is *highly dependent*." Accordingly, under the AFTE standard, testimony by Gerber on knife marks would be inaccurate and therefore unreliable.

Another important consideration is that, at least in this case, the decision of Gerber could not be subject to any meaningful cross-examination. During the *Daubert* hearing, Defendant tried to cross-examine Gerber on her determination of the match. However, any time Defendant tried to

draw into question the match based on the photographs provided to the defense and available at the *Daubert* hearing, Gerber would state that the photograph in question was "not a great photograph, which is why it's difficult to see from here." DN. 102, pg. 2-36. Accordingly, the match determination was effectively insulated from any meaningful cross-examination by the inability to produce photographs representative of what an examiner sees under the actual comparison microscope. Given that the Supreme Court requires "that reliability be assessed in a particular manner: by testing in the crucible of cross-examination," the inability to conduct meaningful cross-examination weighs strongly against admissibility. *Melendez-Diaz v. Massachusetts*, 129 S. Ct. 2527, 2536 (2009) (*citing Crawford v. Washington*, 541 U.S. 36, 61-62 (2004)).[2]

Despite this, the government suggests that every Federal court to consider firearms and tool marks has decided that they are admissible and that this Court should follow that precedent. However, all of the citations provided by the government involve firearm cases. Similarly, this Court's research has not revealed a single federal case ruling on the admissibility of knife identification specifically, or tool mark identification generally. There are important distinctions between firearm and tool mark identification and these distinctions tend to make tool mark identification particularly unreliable. As a result, this Court does not think that precedent in firearm identification is applicable to tool mark identification. While some state courts have considered the issue, the cases are sharply divided and largely predate the Supreme Court's decision in *Daubert*. *See, e.g.*, *Ramirez v. State*, 542 So. 2d 352 (Fla. 1989) (excluding knife marks); *State v. Churchill*, 231 Kan. 408 (1982) (admitting knife marks); *but cf.*, *Ramirez v. State*, 810 So. 2d 836 (Fla. 2001)

---

[2]While this Court has different duties in determining the admissibility of hearsay and expert testimony, *compare* Fed. R. Evid. 702 *with* Fed. R. Evid. 802, the reliability ensured by cross-examination applies to both.

(excluding knife marks after *Daubert*, but still applying *Frye*, per state law).

The first important distinction between tool marks and firearms is that while a firearm can generally only be used in one way, by pulling the trigger, a tool can be used in any number of ways, such as by slashing, stabbing, prying, or scraping. DN 104, pg. 3-21. In addition, once the method of use is selected, there are a number of additional variables that must be considered for tool marks, such as the pressure exerted on the tool and the angle at which the tool is used. *Id.* These variables are also not present in firearm identifications.

The second important distinction is that, given the subjective nature of firearm and tool mark identification, the relative frequency of firearm cases compared to tool mark cases - and knife cases in particular - necessarily makes a tool mark identification less reliable than a firearm identification. *See* DN 102, pg. 2-49 ("We don't typically see a lot of knife cases."). This goes directly to the "skill and experience" an examiner is "expected to draw on[.]" *Strengthening*, pg. 155. Ensuring that the agreement in question "exceed[s] the best agreement demonstrated between tool marks known to have been produced by different tools" when an examiner is basing the determination on limited exposure to said marks leads to unreliability. In addition, given that 25-29% of striae in a known non-match tool mark have been found to match up, compared to 15-20% of striae in a known non-match firearm, an examiner that frequently exams firearms may determine a tool mark match at a threshold of matching striae much lower than appropriate. DN 104, pg. 3-9 (referring to Butcher and Pugh, "A Study of Marks Made by Bolt Cutters" (1975) and Burd and Kirk, "On Toolmarks, Factors in their Comparison" (1942)).

Finally, also considering the subjective nature of identification, strides made in firearm identification such as the IBIS database have allowed the firearm identification field to make solid

progress towards objectivity - tool mark identification has made no such similar progress. While the final determination of a match with firearms is always left to an examiner, the IBIS database can both help with the identification process and expose examiners to a variety of different markings, allowing them to "become more familiar with similarities in striation patterns made by different firearms." *Strengthening*, pg. 153. Without the exposure of a database, examiners are forced to rely solely on their own experiences and training. As already discussed, Gerber has limited experience and limited training in knife identification.

Rather than comparing tool mark identifications to the highly developed firearm identifications, this Court thinks the more relevant comparison is to the similarly controversial polygraph test. Given the varied testimony at the *Daubert* hearing and the conclusions related through the *Strengthening* report, there is "simply no consensus that [tool mark] evidence is reliable." *United States v. Scheffer*, 523 U.S. 303, 309 (1998) (discussing polygraph before alteration). Polygraph studies have shown widely varying error rates. *Id.* at 310. Showing even less reliability, the field of tool marks does not have enough studies, conducted to scientific standards, to give a "statistical foundation for estimation of error rates."[3] *Strengthening*, pg. 154. Despite "advances in polygraph instrumentation and technique, questions continue to abound about the reliability of polygraph." *United States v. Wright*, 22 F. Supp. 2d 751, 754 (W.D. Tenn. 1998). This statement is almost identical to that contained in the *Strengthening* report - "Newer imaging techniques assess toolmarks using three-dimensional surface measurement data, taking into account

---

[3]This Court feels that it is once again important to distinguish that tool marks, for this opinion, do not include firearms. The body of work pertaining to firearms vastly exceeds that related to tool marks. Various courts have time and again found the firearm studies to be scientifically reliable, and this Court does not dispute that.

the depth of the marks. But even with more training and experience using newer techniques, the decision of the toolmark examiner remains a subjective decision based on unarticulated standards[.]" *Id.* at 153-54. "Although the degree of reliability of polygraph evidence may depend upon a variety of identifiable factors, there is simply no way to know in a particular case whether a polygraph examiner's conclusion is accurate, because certain doubts and uncertainties plague even the best polygraph exams." *Scheffer*, 523 U.S. at 312. Testimony at the *Daubert* hearing demonstrated that these concerns are equally valid for tool mark identifications. Accordingly, similar to polygraphs, it is important for this Court to thoroughly examine the underlying reliability of a tool mark identification before allowing expert testimony at trial. See *Wolfel v. Holbrook*, 823 F.2d 970 (6th Cir. 1998). As discussed above, a thorough examination of the facts and science present in this case must lead to a finding of unreliability and exclusion.

This is not to say that a tool mark identification could never be admissible. Given an appropriate amount of expertise in marks by a particular tool, an examiner may very well be able to make an identification with the amount of reliability required for a court of law. In addition, there was testimony that some examiners have tried to introduce a quantitative standard to supplant the current subjective standard. Testimony indicated that a run of six matching striae or two sets of three matching striae have never been found in a non-match. Such a method of identification may be reliable regardless of the experience of the examiner. However, these are not the issues currently before the Court.

In conclusion, Gerber does not have the "skill and experience" with knife marks to reliably make the required subjective determination. Accordingly, the motion to exclude her testimony is GRANTED.

**CONCLUSION**

For the foregoing reasons, the government's Motion to Exclude Testimony of Defense Expert Witnesses is GRANTED in part and DENIED in part as is consistent with this opinion. The Defendant's Motion to Exclude Testimony is GRANTED in part and DENIED in part as is consistent with this opinion.

IT IS SO ORDERED.