```
 1                    UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF KENTUCKY
 2                        PADUCAH DIVISION

 3   UNITED STATES OF AMERICA,    )  Case No. 5:08-CR-38
                                  )
 4           Plaintiff,           )
                                  )
 5   VS.                          )
                                  )
 6   BILLI JO SMALLWOOD,          )
                                  )  November 4, 2010
 7           Defendant.           )  Louisville, Kentucky

 8          *****************************************
        TRANSCRIPT OF HEARING ON DEFENDANT'S SECOND MOTION FOR
 9                 REVOCATION OF DETENTION ORDER
                     BEFORE THOMAS B. RUSSELL
10            UNITED STATES DISTRICT CHIEF JUDGE
            *****************************************
11

12   APPEARANCES:

13   For United States:       James R. Lesousky, Jr.
                              Marisa J. Ford
14                            U.S. Attorney's Office
                              510 West Broadway
15                            Louisville, KY 40202

16   For Defendant:           Laura R. Wyrosdick
                              Western Kentucky Federal
17                               Community Defender, Inc.
                              629 S. 4th Avenue, Suite 200
18                            Louisville, KY 40202

19                            Rob Eggert
                              600 W. Main Street, Suite 300
20                            Louisville, KY 40202

21   [Defendant present.]

22                    Terri L. Turner, RMR
                      Official Court Reporter
23                    133 U.S. Courthouse
                        501 Broadway
24                    Paducah, KY 42001
     Proceedings recorded by mechanical stenography, transcript
25   produced by computer.
```

1      (Begin proceedings in open court at 9:30 a.m.)

2           THE COURT:  Well, good morning.

3           MR. LESOUSKY:  Good morning, Judge.

4           MS. WYROSDICK:  Good morning, sir.

5           THE COURT:  Ladies and gentlemen, I apologize for

6    being late.  I just had something that come up that I had to

7    take care of at the time.

8       We're here today in the case of *United States of America vs.*

9    *Billi Jo Smallwood* on the motion of defendant, Ms. Smallwood,

10   second renewed motion for revocation of detention order and for

11   the Court to hold a prompt hearing on the motion.

12      Who's present on behalf of the United States?

13          MR. LESOUSKY:  Judge, Jim Lesousky and Marisa Ford.

14   We represent the government this morning.

15          THE COURT:  And for Ms. Smallwood?

16          MS. WYROSDICK:  Good morning, sir.  Laura Wyrosdick

17   and Rob Eggert on behalf of the defense.  And Ms. Smallwood is

18   present and before the Court.

19          THE COURT:  I have read the motions.  I have read

20   the -- I've read all the transcripts of other hearings, re-read

21   those again before today.  I'd be happy to hear any new

22   testimony you wish to present or any other evidence or

23   arguments.

24          MS. WYROSDICK:  I have her family sitting in the

25   court, and I'd like to present them for possibility of

```
 1  custodians.
 2          THE COURT:  Yes, ma'am.
 3          MS. WYROSDICK:  Yes, ma'am.  I call Rebecca Rotz,
 4  please.
 5              REBECCA ROTZ, DEFENDANT WITNESS, SWORN
 6                      DIRECT EXAMINATION
 7  BY MS. WYROSDICK:
 8  Q.  Could you state your name, please?
 9  A.  Rebecca Lee Rotz.
10  Q.  And your relationship to Billi Jo Smallwood?
11  A.  She's my daughter.
12  Q.  And where do you live?
13  A.  Brunswick, Georgia.
14          THE COURT:  Say your last name again for me, ma'am,
15  please.
16          THE WITNESS:  Rotz, R-o-t-z.
17  Q.  How far did you travel to be here today?
18  A.  It was over 740 miles, I believe.
19  Q.  Is this your second or third trip to testify on behalf of
20  your daughter?
21  A.  I think third maybe.
22  Q.  When you testified before at the last bond hearing, we
23  discussed the possibility of you being a third-party custodian
24  for Billi Jo.
25  A.  Yes.
```

1   Q.   Can you describe to the Court -- you live in a house or an

2   apartment?

3   A.   I live in a house that I own.

4   Q.   And do you have room for Billi Jo Smallwood to stay with

5   you?

6   A.   Yes.

7   Q.   And who lives in that house?

8   A.   Just myself.

9   Q.   Your husband live there?

10  A.   No.

11  Q.   Okay.  Just yourself?

12  A.   Yes.

13  Q.   Do you work during the day?

14  A.   No.  I'm retired.

15  Q.   So you are available to be home to watch Billi Jo Smallwood

16  24 hours a day if possible?

17  A.   Yes.

18  Q.   Do you have a landline phone?

19  A.   No.

20  Q.   Okay.  Could you get one if the judge says I'm going to put

21  her on an ankle monitor or something that runs on a landline

22  phone?  Would you be able to get that, secure that?

23  A.   Yes.

24  Q.   Last time we discussed this, but it's been a while.  What

25  does it mean to you to be a third-party custodian?  What would

1    your -- what would your job be?

2    A.   Well, I understand that I would be completely responsible

3    for complying with what, you know, the Court says for her to do

4    and, you know, being there, going through all the guidelines and

5    making sure of everything.  And if she doesn't follow the

6    guidelines, I would have to make a call.

7    Q.   And why would this Court believe that you would turn in your

8    daughter if she does something wrong?

9    A.   Because Billi Jo, like the rest of the family, we want her

10   name cleared.  We want this done.  We want the truth to come

11   out.  We want whoever did this to be found.

12   Q.   Does she have any prior criminal history?

13   A.   Oh, no, no.

14   Q.   Is she a flight risk in any fashion?

15   A.   No.  She would never ever leave, because she more than any

16   of us want this to be done and done correctly.  And because of

17   losing her children, she wants this done, and she wants to find

18   out who did this.

19   Q.   And I recall that the fire occurred in May of 2007.  And as

20   of June 2007, they had already decided that it was arson?

21   A.   Right.

22   Q.   But she continued to work with ATF and law enforcement,

23   didn't she?

24   A.   Yes.

25   Q.   On her own accord?

1   A.   Yes.

2   Q.   Do you feel that she is dangerous to anybody?

3   A.   No, not at all.

4   Q.   Have you ever seen her do anything, act any way that would

5   be dangerous to anyone?

6   A.   No.

7   Q.   What about with her child Nevaeh?  She was out before she

8   was arrested for a substantial period of time.  Did you observe

9   her with Nevaeh?

10   A.   Yes.  Well, I saw them every day at least.  If not every

11   day, every other day for sure.  I'd either go where they lived

12   or they came to my house.  We went to church every Sunday,

13   sometimes on Wednesdays.  So her sister, Billi Jo, Nevaeh, and I

14   especially had a real close bond and saw each other all the

15   time.

16   Q.   And how did she act towards the child?

17   A.   Perfectly, like -- beyond what you would say a mother would

18   be.  Nevaeh is her world.

19   Q.   Your daughter Jennifer Rotz is also willing to be a

20   third-party custodian; is that correct?

21   A.   Yes.

22   Q.   Has also traveled 17-some-odd hours to be here?

23   A.   Yes.

24   Q.   Testified at the last bond hearing?

25   A.   Yes.

1    Q.  Do you have anything in addition that you want to tell the

2    judge to assist him in making his decision as to whether or not

3    she's a flight risk or danger to the community?

4    A.  I know that she would never ever -- we've never been through

5    anything like this, and I know that she wants this done

6    correctly.  And I know Billi Jo would never ever be a flight

7    risk, if that's what you call it, because she wants this all to

8    be done.  And Billi Jo is the best mother.  She wants to be with

9    her daughter, and as soon as all this gets taken care of, she

10   knows that then she can.

11   Q.  And Billi Jo has ties to that community with the church?

12   A.  Yes, yes.  We've had our pastor sending letters.  We've had

13   other church members.  They stay in close contact with me.

14   They're all at home now waiting for me to make a call to say,

15   you know, we're bringing her home.  And everybody's just missing

16   her.

17           MS. WYROSDICK:  Okay.  Thank you.  I don't have

18   anything, but the government might want to ask you some

19   questions or the judge.

20           MR. LESOUSKY:  I don't have anything, Judge.  Thank

21   you.

22           THE COURT:  Where is her daughter Nevaeh?  I may be

23   mispronouncing it.

24           THE WITNESS:  Nevaeh.

25           THE COURT:  Nevaeh.  Where is her daughter now?

1          THE WITNESS:  Where is Nevaeh?

2          THE COURT:  Yes, ma'am.

3          THE WITNESS:  With her father.

4          THE COURT:  With her father.  And where is the father?

5          THE WITNESS:  He's right there.

6          THE COURT:  Okay.

7          MS. WYROSDICK:  He's present in court, sir.

8          THE COURT:  Thank you, ma'am.

9          THE WITNESS:  Thank you.

10         MS. WYROSDICK:  The defendant calls Stephanie Hamlin.

11           STEPHANIE HAMLIN, DEFENDANT WITNESS, SWORN

12                        DIRECT EXAMINATION

13   BY MS. WYROSDICK:

14   Q.  Could you state your name, please?

15   A.  Stephanie Michelle Hamlin.

16   Q.  And what is your relationship, if any, to Billi Jo

17   Smallwood?

18   A.  I'm a family friend.  I've been a friend for 11 years now.

19   Q.  And where do you live?

20   A.  I live in Asheville, North Carolina.

21   Q.  And you've come a significant amount of miles and time to be

22   here today?

23   A.  Six very long hours.

24   Q.  And did you come to her last bond hearing, as well?

25   A.  I did.

1   Q.  And we also discussed the ability for you to be her

2   third-party custodian, did we not?

3   A.  We did.

4   Q.  And can you describe where you live in North Carolina?

5   A.  Asheville.

6   Q.  Okay.  And do you have room for Billi Jo Smallwood to stay

7   there?

8   A.  I do.

9   Q.  And does she -- do you have any weapons in the house

10  whatsoever?

11  A.  No.

12  Q.  And do you have a landline phone?

13  A.  I do not, but I'm willing to get one.

14  Q.  And it's my understanding that you work; isn't that correct?

15  A.  That is correct.

16  Q.  But is there someone at home 24 hours to --

17  A.  My fiancé works from home.

18  Q.  And is he in agreement with her staying there?

19  A.  He is, absolutely.  He can't wait to meet her.

20  Q.  And what -- I'm sorry?

21  A.  I said he can't wait to meet her.

22  Q.  And what is your understanding of what it means to be a

23  third-party custodian?

24  A.  It means that we will comply to the Court and make every

25  hearing date and anything that we have to do to be here to get

1    this over with, and that if for some reason she would disobey,

2    that I am to turn her in.

3    Q.   And do you understand that if you don't turn her in, you

4    would be responsible to the Court --

5    A.   Absolutely.

6    Q.   -- you would be in trouble?

7    A.   I do.  I take that very seriously.

8    Q.   Could you describe to the Court Billi Jo?  Is she a

9    dangerous person?

10   A.   Absolutely not.  I've never heard her raise her voice.  She

11   is an amazing person.  She's always been sweet and loving and

12   caring, and I've never ever seen her be violent in any way.

13   Q.   Have you continued to correspond with her while she's in

14   custody?

15   A.   Yeah.  We write letters.

16   Q.   And has she ever said anything about running away --

17   A.   Absolutely not.

18   Q.   -- taking off?

19   A.   No.

20   Q.   And do you believe that knowing her for 10 or 11 years she's

21   the type of person that would leave the jurisdiction?

22   A.   No, definitely not.  She has too many family ties, and she

23   has a daughter that she cares so much about.  And she just wants

24   this to be over with, like we do, all of us.

25   Q.   Is there anything else that you would like to tell the Court

1  before he makes his decision regarding her release?

2  A.  Only that we pray every day for this to be over with and

3  that if she is released today that we will make sure that she

4  doesn't go anywhere and that she's with us 24 hours and that we

5  comply completely.  And we beg that she is released today.

6  Q.  Do you have a plan for getting her back to court?

7  A.  I do.

8  Q.  What would it be?

9  A.  Well, we drive.

10  Q.  You would put her in the car physically and bring her?

11  A.  I would put her in the car physically.  I can carry her.  I

12  would carry her butt.  Sorry.

13        MS. WYROSDICK:  I don't have anything further, but the

14  prosecution might want to ask you something.

15        THE WITNESS:  Okay.

16        MR. LESOUSKY:  We don't have any questions, Judge.

17  Thank you.

18        THE COURT:  Thank you, Ms. Hamlin.

19        THE WITNESS:  Thank you.

20        MS. WYROSDICK:  I'd call Wayne Smallwood.

21          WAYNE SMALLWOOD, DEFENDANT WITNESS, SWORN

22                    DIRECT EXAMINATION

23  BY MS. WYROSDICK:

24  Q.  Could you state your name, sir?

25  A.  Wayne Smallwood.

1    Q.  And your relationship to the defendant here?

2    A.  I'm her husband.

3    Q.  And you've heard it said that you were the alleged intended

4    victim of this crime?

5    A.  Yes, ma'am.

6    Q.  Do you believe that?

7    A.  I think it's preposterous.

8    Q.  Why do you think that's preposterous?

9    A.  Billi Jo doesn't have a mean bone in her body.  She loved

10   me, and she loved her kids.  The kids came first in everything.

11   Q.  Can you describe her relationship with her children before

12   the fire?

13   A.  Better than I've ever seen with anybody.  She's a great

14   mother.  She's always been loving and caring.  She's always been

15   there for the kids.  She's always put the kids first.

16   Q.  Do you believe she would ever do anything to put her

17   children in danger?

18   A.  Never.

19   Q.  You're also willing to be her third-party custodian; is that

20   correct?

21   A.  Yes, ma'am.

22   Q.  But you also understand that the Court might order no

23   contact; is that correct?

24   A.  I understand that.

25   Q.  And are you willing to abide by a no contact if the judge

1  says that?

2  A.  Yes, ma'am.  The only thing that -- the only thing I'm

3  worried about is I have a daughter that Billi Jo needs to be

4  with.  Nevaeh needs to be with her.  Nevaeh goes to bed crying

5  every night asking for her mommy, and I don't know what to tell

6  her.  You know, it's hard for me to sit and explain to her that

7  mommy's not home right now.  But Billi Jo is such a caring

8  person that she has that strong bond with Nevaeh that she had

9  with Rebekah and Sam, also.

10  Q.  Does she talk to her on the phone?

11  A.  She talks to her a lot.  I make sure of it.

12  Q.  Nevaeh was told that mommy hopes to come home when the

13  pumpkins come out; isn't that right?

14  A.  Yeah.

15  Q.  Do you think that the child is suffering because her mother

16  isn't -- doesn't have the ability to have a relationship with

17  her?

18  A.  Every day.  I do the best I can, but there's some things I

19  just -- a dad can't teach a little girl.  She needs her mother

20  for it.

21       MS. WYROSDICK:  I don't have anything else, but the

22  prosecution might want to ask you something.  So just listen to

23  their questions.

24                    CROSS-EXAMINATION

25  BY MR. LESOUSKY:

1    Q.   Mr. Smallwood, had you-all had some problems in your

2    marriage both before and after the fire?

3    A.   Everybody has problems in their marriage.

4    Q.   Well, were the problems -- were there arguments that took

5    place?

6    A.   I mean, we had our disagreements just like any other married

7    couple, but we always put the kids first, and we've always --

8    you know, no matter what, the kids came first.

9    Q.   I understand that.  Did it come to any violence between you

10   and Billi Jo, not the children?

11   A.   Yeah.  Billi Jo's never had any violence.  She's never --

12   Q.   That's not what I asked you now.

13   A.   I've done things that I regret.

14   Q.   Did you put a knife to her throat one time?

15          MS. WYROSDICK:  Judge, I'm going to object to the

16   relevance of this.  This occurred after the fire.

17          THE COURT:  I think --

18          MR. LESOUSKY:  Well, he's asking whether he could be a

19   custodian.

20   Q.   And I'm not trying to embarrass you up here.  I mean, she's

21   asked if you could be a custodian for Ms. Smallwood, your wife,

22   so that's the purpose of my questions.  I'm not trying to get

23   you in any more trouble.

24      You actually served time in jail because of that incident,

25   didn't you?

1    A.   Yes.

2    Q.   All right.  So there has been more than just arguments that

3    married couples have?

4    A.   That incident was related to PTSD after coming back from

5    Iraq and losing my kids and my brother and my father all within

6    six months.

7    Q.   I know you've been through quite a bit.  You and I have

8    talked, and I respect what you're going through.  I'm not asking

9    you these questions in an attempt to embarrass you, but they've

10   proposed that you be a possible custodian.  And so the purpose

11   of my questions is to make the Court aware that there have been

12   problems more than just arguments that occur with married

13   couples.

14       I understand that you've had some -- you're suffering some

15   of the results of serving over there, and I'm not going into the

16   cause of it.  I'm saying, there were times when what occurred

17   between you and Billi Jo was violent?

18   A.   Yes.  But if you're going to bring that up, then the cause

19   needs to be addressed, I believe.

20   Q.   All right.

21   A.   I've received medication, I've received treatment for that.

22   I wasn't in my right mind when that incident occurred.

23   Q.   Are you still getting treatment for that, Wayne?

24   A.   I see a psychiatrist every week.

25   Q.   All right.  Are you taking medication at this time?

1    A.   Yes, I do.  I take about 12 different medications.

2    Q.  All right.  And the medication is, what, to relieve some of

3    the depression and other symptoms?

4    A.  The depression, the night terrors that I was having.  I was

5    having relapse night terrors, so I take sleeping medication to

6    help me have a better night's sleep and I guess to subside my

7    dreams.

8    Q.  All right.  Now, this treatment, did it begin before her

9    arrest in November of '08, or has it occurred after Billi Jo's

10   arrest?

11   A.  The treatment -- the treatment started as soon as I got back

12   from Iraq, and then --

13   Q.  Well, when did you get back from Iraq?

14   A.  It was in '07.

15         MS. WYROSDICK:  Again, I'm going to object to

16   relevance.

17         THE COURT:  Yeah.  I'm going to sustain the objection.

18   I don't think that has anything -- when it started --

19         MR. LESOUSKY:  Well, I'm trying to find out --

20         THE COURT:  -- in relation -- let me finish.

21     I don't think when it started in relation to the incident

22   makes any difference.  I know he's been under treatment, and I

23   think the fact that he's been under treatment and the fact that

24   he's had these issues related, as he says, to his service and

25   things in that regard may have some bearing on third-party

1   custodian.  I think when it started doesn't have any bearing, in

2   my mind -- whether it started before the incident has any

3   bearing, in my mind, about the third-party custodian issue.

4   BY MR. LESOUSKY:

5   Q.  If Billi Jo were released, would you anticipate that you and

6   her would live together as you did before she was arrested?

7   A.  We would be willing to abide with what the Court said.  Like

8   I said, the main priority is reuniting Billi Jo with Nevaeh.

9   That's the main goal, and that's what Nevaeh needs.  She's the

10  one that's suffering out of this the most.  I understand Billi

11  Jo's in jail and she's suffering, but Nevaeh is the one that's

12  suffering the most.

13      It's been two years, and she's about to turn five years old.

14  She's been without her mother for two years.  And every night,

15  it's -- it's hard for me to sit down and explain her mother's

16  not there knowing that Billi Jo is such a caring person and that

17  she loved her kids more than anything in the world.  It's hard.

18  It's hard for me to sit and talk to a four-year-old about it.

19      And I make sure that Billi Jo talks to Nevaeh on the phone

20  as much as possible.  We write letters, we try to correspond,

21  and we try to keep that tie.

22  Q.  Is it your hope that you would -- that she would -- that the

23  Court would release her to your custody?

24  A.  Whether it be my custody or her mother's custody or her

25  sister's custody, it doesn't matter.  As long as the Court

1    releases her.  I feel that they have the wrong person in custody

2    to begin with.

3    Q.  I understand.  You're currently assigned to Fort Campbell;

4    is that right?

5    A.  Yes, sir.

6    Q.  So if the Court released her to your custody, she's going to

7    be at Fort Campbell with you; is that right?

8    A.  Yes, sir.

9    Q.  All right.  If she's released to the custody of her mom, her

10   mom lives in Brunswick, Georgia.  Her friend lives in Asheville,

11   North Carolina.  Both are pretty good distances for you.  You're

12   currently assigned to Fort Campbell; is that right?

13   A.  Yes, sir.

14   Q.  And you expect to be there for some months, I assume.  I

15   think you told me before maybe as long as six months, is that

16   right, before you -- whatever transition occurs?

17   A.  I'm already in the WB process, the transition process.  The

18   only thing I'm waiting on is for my paperwork to come back from

19   San Antonio, Texas.  It can be one day.  It can be one week.  It

20   can be one month.

21        THE COURT:  What do you mean?  Are you getting out of

22   the military?

23        THE WITNESS:  I'm being medically discharged, sir, for

24   the sleeping stuff and diabetes and my ankle and my back

25   problems, just a number of things.  I wanted to stay in, but

```
 1   with the persisting problems, it's just too many problems to

 2   return to duty.  So I'm being medically discharged.

 3           THE COURT:  Thank you.

 4   BY MR. LESOUSKY:

 5   Q.  I guess my question is, let's assume the judge releases

 6   Ms. Smallwood to her mom or to -- I forget what the young lady's

 7   name was.

 8           MS. WYROSDICK:  Hamlin.

 9   Q.  -- Ms. Hamlin, both of which are pretty good distances from

10   you.  Would Nevaeh go with her mom, or would she go with you or

11   stay with you, or what is the -- have you-all thought that

12   through?

13   A.  We have talked about it a little bit.  Like I said, it

14   depends on what the Court suggests and what kind of visitations

15   they put in place.  We're willing to abide by whatever.

16   Q.  Well, if she goes with her mom, is Nevaeh going with her?

17           MS. WYROSDICK:  Judge, he's already answered this

18   twice.

19           THE COURT:  I think he's answered it.  I think the

20   Court would be the one to make that determination probably.

21           MR. LESOUSKY:  That's all I have.

22           MS. WYROSDICK:  I would call Mr. Leppert to the stand.

23           THE COURT:  Thank you, Mr. Smallwood.

24           THE WITNESS:  Yes, sir.

25            CHARLES LEPPERT, DEFENDANT WITNESS, SWORN
```

```
 1                      DIRECT EXAMINATION
 2   BY MS. WYROSDICK:
 3   Q.  Good morning, sir.  Thank you for coming.
 4   A.  Good morning.
 5   Q.  Could you state your name, please?
 6   A.  Charles Leppert.
 7   Q.  And what is it that you do?  How do you have contact with
 8   Billi Jo Smallwood?
 9   A.  I meet with her once a week principally for Bible studies.
10   Q.  And how long have you been meeting with her?
11   A.  Just short of a year.
12   Q.  And can you tell the Court your impression of Billi Jo
13   Smallwood?
14   A.  I meet with 11 people right now, and of all the people,
15   she's the quickest learner.  It's hard for me to even conceive
16   that she did such a thing.
17           THE COURT:  Spell your last name for me, please, sir.
18           THE WITNESS:  L-e-p-p-e-r-t.
19           THE COURT:  Thank you.
20   Q.  Have you been in a position to judge her faith?  In other
21   words -- let me ask it better.  Is she just putting on this face
22   so she can look better?
23   A.  No.
24   Q.  How do you know that?
25   A.  I've had some experience in that, and just the things she
```

1  says, the way she acts.  There's nothing inconsistent at all in

2  Billi Jo's actions.

3  Q.  Has she seemed distressed that she's been in custody?

4  A.  Yes.

5  Q.  Has she talked about missing her daughter?

6  A.  Every time.

7  Q.  And what can you tell the judge about whether or not she

8  should be released today?

9  A.  Well, it's just hard for me to conceive that this would be

10  even a possibility for Billi Jo.

11  Q.  Why do you say that?

12  A.  Just her mannerisms, just the way she talks, her strength of

13  faith, and then in comparing her with others that I've talked

14  to.

15  Q.  She talk about the other children, the deceased children?

16  A.  Yes.

17  Q.  Does she talk about them with love?

18  A.  Yes, very much so.

19  Q.  Do you believe she would ever do anything to put them in

20  danger?

21  A.  I can't even conceive of it.

22         MS. WYROSDICK:  Thank you.  I don't have anything

23  else, but the government may want to ask you questions.

24         MR. LESOUSKY:  I don't have any questions of the

25  gentleman.  Thanks.

1          THE COURT:  Mr. Leppert, let me ask you a couple

2    questions.

3          THE WITNESS:  Yes.

4          THE COURT:  You indicated that you have weekly Bible

5    studies --

6          THE WITNESS:  Yes.

7          THE COURT:  -- at where she's staying, I guess.

8          THE WITNESS:  That's correct.

9          THE COURT:  What's your position?  Are you --

10         THE WITNESS:  I'm not a pastor.

11         THE COURT:  Does the jail make that available to you?

12   Are you a pastor?  Are you a lay minister?  If you can tell me.

13         THE WITNESS:  I'm a lay minister, and I just go at

14   regular visiting times and meet with her.

15         THE COURT:  And is this something you've been doing at

16   this facility for some period of time?

17         THE WITNESS:  Just since she and one other young lady

18   have been there that I met with at Oldham County jail first.

19         THE COURT:  Okay.

20         THE WITNESS:  They were transferred there, and so I

21   began going down there.

22         THE COURT:  So there's just two people in your group?

23         THE WITNESS:  Two people that I meet with.  I meet one

24   on one.

25         THE COURT:  One on one?

```
 1                 THE WITNESS:  Yes.
 2                 THE COURT:  And how long have you been performing --
 3      have you been performing this service at Oldham or other
 4      facilities before this?
 5                 THE WITNESS:  Yes.
 6                 THE COURT:  How long have you been doing that?
 7                 THE WITNESS:  I've been doing this for three years.
 8                 THE COURT:  Three years.  Is it through a church that
 9      you do this?
10                 THE WITNESS:  I represent our church.
11                 THE COURT:  And what church is that?
12                 THE WITNESS:  Commonwealth Bible Church.
13                 THE COURT:  And it's just a ministry that you-all
14      provide?
15                 THE WITNESS:  That's correct.
16                 THE COURT:  Do you do it at other facilities other
17      than Oldham?
18                 THE WITNESS:  Yes, sir.
19                 THE COURT:  Where else?
20                 THE WITNESS:  Marion County and Floyd County in
21      Indiana, Floyd County jail.
22                 THE COURT:  And it's just a Bible study and
23      discussion?
24                 THE WITNESS:  Correct.
25                 THE COURT:  Thank you, sir.
```

```
 1            MS. WYROSDICK:  Your Honor, we have a witness by

 2    phone.  Her name is Tammy Bowen.  She's Billi Jo's aunt.  I have

 3    her phone number here and she's standing by, or I can proffer

 4    the testimony, whichever you prefer.

 5            THE COURT:  I don't mind listening to her, but I don't

 6    know how to do that.  So you'd have to tell the technical people

 7    to be up here to --

 8            MS. WYROSDICK:  I apologize.

 9            THE COURT:  I mean, I can --

10            MS. WYROSDICK:  Well, I can proffer her --

11            THE COURT:  I can get them here.  Tell me what she's

12    going to say, and we can determine whether or not --

13            MS. WYROSDICK:  Basically, she is --

14            THE COURT:  Tell me who she is.

15            MS. WYROSDICK:  She is Billi Jo --

16            THE COURT:  Tell me her name again.

17            MS. WYROSDICK:  Tammy Bowen, B-o-w-e-n.  She is Billi

18    Jo Smallwood's aunt.  She is also willing to serve as a

19    third-party custodian.

20        She lives in Edgewater, Florida.  She has a landline phone

21    which would be accessible if the Court were to release her and

22    permit a monitor of some kind.  She has no weapons whatsoever.

23    She has plenty of room for Billi Jo.  She does not feel she's

24    dangerous in any way, shape, or form, and she believes in her

25    heart that she would never run or take off.  And she's willing
```

```
 1    to be her third-party custodian and abide by each and every rule
 2    that the Court would set.
 3              THE COURT:  And is she employed?
 4              MS. WYROSDICK:  Sir?
 5              THE COURT:  Is she employed?
 6              MS. WYROSDICK:  I believe she is employed.
 7              THE COURT:  And does she live by herself or with her
 8    family?
 9              MS. WYROSDICK:  I don't recall.  She is married,
10    according to our investigator.
11              THE COURT:  Does she have children at home?
12              MS. WYROSDICK:  No children.  They're grown.
13              THE COURT:  Just grown children.  Thank you.
14              MS. WYROSDICK:  Thank you, Judge.  Those are all the
15    witnesses that we have today.
16              THE COURT:  Any additional witnesses on behalf of the
17    United States?
18              MR. LESOUSKY:  None from the government, Judge.  Thank
19    you.
20              THE COURT:  Let me hear your argument.
21              MS. WYROSDICK:  Yes, Your Honor.  One moment, sir.
22         Your Honor, we filed this bond motion and allege that there
23    are different circumstances now than there were before.  The
24    last time that we were in front of Your Honor for a revocation
25    of her detention, a couple of things bothered the Court.
```

1      One of the things that bothered the Court was the fact that

2   the ultimate penalty was in play.  Since that time, the

3   Department of Justice has stated that they are not going to seek

4   the death penalty in this case.

5      Your Honor looked at the different characteristics that are

6   necessary under the statute.  You looked at the nature and

7   circumstances of the offense charged.  You looked at the weight

8   of evidence against the person.  You looked at the history and

9   characteristics of the person, including the person's character,

10  their community ties.  You looked at the nature and seriousness

11  of the danger to any person in the community.

12     At that time, Your Honor said some came down on behalf of

13  Billi Jo Smallwood, some came down on behalf of the government.

14  I submit to you that there is nothing at this point that is on

15  the government's side any longer.

16     The grand jury was told by not one but two witnesses that

17  this residence was secured.  And that's really important, Judge,

18  because if the residence is secured, then no one could set the

19  fire except someone that was in the residence.  And their expert

20  was wrong.  And we brought an expert in there who proved, who

21  asked to have the actual window, and when their expert looked at

22  it agreed, that the window was open during the fire because

23  there are witness marks that show that and the screen was cut.

24     And when you open that window, Judge, you open that place to

25  the entire world.  Anyone could have come into that place and

1    set that fire.  And the government in their motion, their

2    response, has agreed with that fact.

3        And they are left with two, two other aspects that they put

4    forth in their response.  One, that a knife was found that

5    matches the tire marks on the car.  And Your Honor has heard

6    that testimony and you have heard Ms. Gerber, and you have ruled

7    that she does not have the experience to take one knife and

8    decide by not checking any other knives that that one knife, to

9    the exclusion of all other knives in the world, is the one that

10   matched those tires.

11       The only other factor that they allege is that Billi Jo

12   Smallwood said that she received a threatening phone call on

13   that night and there is no record of a threatening phone call.

14   And we have disputed that, and we have ordered records from

15   AT&T.  And I have one such record in front of me which says as

16   follows:

17       It's from AT&T/Bellsouth.  Criminal AT&T Services,

18   Incorporated, Subpoena Center.  Again, and I quote, "There are

19   generally no records of incoming or local calls for this

20   subscriber account.  So the absence of a record of such a call

21   will not be conclusive as to whether any call was or was not

22   placed or received."  This is from AT&T.  They put this on their

23   documentation.

24       So now all of the evidence, the circumstantial evidence,

25   that the government has against her is gone.

1    We submit to you, Your Honor, that she has already suffered

2    the ultimate punishment.  She has been jailed for over two years

3    for a crime she did not commit.  She lost her two children and

4    that one that she saved she is not permitted to see.

5    Because of the rulings, the government took an interlocutory

6    appeal.  That is their right.  We've looked up another case,

7    which was the Rice case, where a Sixth Circuit -- we did an

8    expedited appeal.  The United States filed notice of appeal

9    2/21/06, the order expediting that appeal was 8/18/06, and the

10   Sixth Circuit opinion didn't come back until 3/2/07.  This is a

11   very significant amount of time.

12   We submit to Your Honor there are certainly people out here

13   who care about her.  She has ties to different communities.  The

14   letters, the outpouring, people that just meet her, the pastors.

15   We can fashion a set of circumstances, and we will be positive

16   that she will not leave wherever you place her and she will

17   abide by each and every solitary condition.

18   Please release her.

19        THE COURT:  United States?

20        MR. LESOUSKY:  Judge, we candidly acknowledge some of

21   the evidence the ground has shifted on.  We put that in our

22   response.  I think we're -- and we're obligated to be candid

23   with them.  I'm not here to argue about whether the phone

24   call -- which by the way, I still need those records from AT&T

25   which I haven't gotten, but I'm aware of the disclaimer on

1    there.

2        There will be -- the evidence is going to be disputed here.

3    The jury will ultimately decide whether she's guilty.  She still

4    remains charged with a very serious crime, and that crime is

5    she's charged, the grand jury has indicted her with setting the

6    fire that caused the death of these two children.

7        Part of your responsibility and part of the reason why you

8    detained her last time was because having been charged with that

9    crime by a grand jury, that represents, you know, a serious

10   danger to the community.  And that was one of the important

11   factors this Court considered, and that factor still remains.

12       We acknowledge there's some ground shifting.  There's going

13   to be arguments from both sides in evidence.  The jury will

14   ultimately decide that, but that jury -- no jury has found her

15   not guilty.  She remains charged this morning as she was --

16           THE COURT:  Haven't found her guilty either.

17           MR. LESOUSKY:  That's correct.  No different than

18   where we were on March the 11th.

19       But we do stand here today in much the same situation, and

20   that is she's charged with a very serious crime that this Court

21   found posed a risk of danger to the community if she were

22   released.  That hasn't changed at all from the time when you

23   heard this evidence and made rulings on her detention back in

24   March of 2009.  That remains the same.

25       Thank you.

1          MS. WYROSDICK:  Just one very quick response, Judge.

2      I wonder if the grand jury had heard from those two

3   witnesses that this apartment was not secured, that the screen

4   had been cut from outside, and that the window was open before

5   this fire if they would have even indicted her.  We don't know.

6          THE COURT:  Yeah.  Well, it's not my position to

7   second-guess the grand jury on what they heard and didn't hear

8   in that regard.

9      Let me have a few minutes.  Okay?

10     (Recess at 10:01 a.m. until 10:53 a.m.)

11         THE COURT:  Ms. Rotz, let me ask you a couple more

12  questions, ma'am.  Just come on up here, and if you would just

13  stand at that podium where I can hear you speak in the

14  microphone.  You'll still be under oath.

15     First of all, I don't know what I'm going to do.  I just

16  need to get some more information, okay, on either side.  You

17  shouldn't interpret my questions going one way or the other.  I

18  don't want you to do that.  I just want to make sure I have all

19  the information.

20     Ms. Rotz, you said you live in a home?

21         MS. ROTZ:  Yes, I do.

22         THE COURT:  And do you own that home?

23         MS. ROTZ:  Yes.

24         THE COURT:  Is it paid for?

25         MS. ROTZ:  Yes.

```
1           THE COURT:  Would you be willing to post a bond in
2    this matter to ensure your responsibilities and the appearance
3    of your daughter?
4           MS. ROTZ:  Yes.  I don't know exactly what that means.
5           THE COURT:  What that means, ma'am, is that I would
6    set a figure of 25 or 50 thousand dollars, and if your daughter
7    didn't show up where she's supposed to or didn't do what she was
8    supposed to do or you didn't do what you were supposed to do,
9    you would forfeit that money.
10          MS. ROTZ:  Yes.
11          THE COURT:  What that would mean is that your home
12   would be security for that and that if you didn't pay the money
13   yourself that they could sell your home to get that money.
14          MS. ROTZ:  Yes.
15          THE COURT:  You would be willing to do that?
16          MS. ROTZ:  Yes.
17          THE COURT:  And you're not -- are you married?
18          MS. ROTZ:  Bill and I have been together for over
19   14 years, but we have separate houses.
20          THE COURT:  Okay.  I mean, the house is solely in your
21   name?
22          MS. ROTZ:  Oh, yes.
23          THE COURT:  So he has no legal title to it?
24          MS. ROTZ:  No, no.  Just myself.
25          THE COURT:  Okay.  And so he lives there with you?
```

```
1              MS. ROTZ:  No.

2              THE COURT:  He have a separate place?

3              MS. ROTZ:  He lives 12 miles away.  He owns his home.

4     I own mine.

5              THE COURT:  And what's his name?

6              MS. ROTZ:  William Herrin.

7              THE COURT:  Pardon?

8              MS. ROTZ:  William Herrin.  Right there.

9              THE COURT:  Can you spell that for me, please?

10             MS. ROTZ:  H-e-r-r-i-n.

11             THE COURT:  Is he employed?

12             MS. ROTZ:  Pardon?

13             THE COURT:  Is he employed?

14             MS. ROTZ:  Oh, yes.

15             THE COURT:  And where does he work?

16             MS. ROTZ:  Dish Net.  Dish Network full-time.

17             THE COURT:  And what does he do there?

18             MS. ROTZ:  He installs cable and computers and things

19    like that.

20             THE COURT:  And how long has he been employed there?

21             MS. ROTZ:  Oh, gosh.

22             THE COURT:  Several years?

23             MS. ROTZ:  Yes.

24             THE COURT:  Okay.  Is he from the Brunswick area,

25    also?
```

```
1            MS. ROTZ:  Yes.

2            THE COURT:  Okay.  Where were you employed before you

3   retired, ma'am?

4            MS. ROTZ:  I was a manager of a place, Cato Company.

5   It's fashions.  It's like a woman's clothing store.  But that

6   was seven years ago, so I'm not working now.

7            THE COURT:  How long did you work there?

8            MS. ROTZ:  Oh, gosh.  Over 10 years, 12 years.

9            THE COURT:  If you don't mind, would you tell me your

10  age?  I hate to ask it.

11           MS. ROTZ:  I'll be 57 this month.

12           THE COURT:  And what's your education, ma'am?

13           MS. ROTZ:  My education?

14           THE COURT:  Your education, your schooling.

15           MS. ROTZ:  I didn't finish high school.

16           THE COURT:  You did not?

17           MS. ROTZ:  No.

18           THE COURT:  Did your daughter?

19           MS. ROTZ:  Billi Jo?

20           THE COURT:  Yes.

21           MS. ROTZ:  She's got, I believe, a GED.

22           THE COURT:  Okay.  Do you have any criminal record?

23           MS. ROTZ:  Oh, me?

24           THE COURT:  Yes, ma'am.

25           MS. ROTZ:  No.  I'm sorry.  No.
```

1        THE COURT:  How about Mr. Herrin?  Are you aware --

2        MS. ROTZ:  No, not even any parking ticket, nothing.

3   Nothing in our entire life.

4        THE COURT:  How many children do you have?

5        MS. ROTZ:  I have four.

6        THE COURT:  Where do they live?

7        MS. ROTZ:  We all live in the same town.  In fact --

8        THE COURT:  Did any of the children graduate from high

9   school?

10        MS. ROTZ:  Jennifer, my daughter Jennifer.  And I

11  think the boys got their GEDs.  I'm not entirely sure.  But

12  they're grown.  They're 39, 38, 37, and 34 years old.  And the

13  reason --

14        THE COURT:  Do you know if any of your children have a

15  criminal record?

16        MS. ROTZ:  I can't say for the boys for sure.  I think

17  Ricky probably has had maybe a few things in the past and --

18        THE COURT:  What do you mean by "a few things"?

19        MS. ROTZ:  Like traffic-type violations.

20        THE COURT:  Other than traffic violations, have they

21  had any criminal record?

22        MS. ROTZ:  Not -- no, nothing criminal.  Criminal?  I

23  don't exactly understand.  Like something like this?

24        THE COURT:  Well, you know, they may have been charged

25  with some -- young people from time to time have gotten a

1    problem with marijuana --

2          MS. ROTZ:  Oh, no, no.

3          THE COURT:  -- some type of dope.  They may have been

4    charged with bad checks.

5          MS. ROTZ:  Oh, no.

6          THE COURT:  Anything like that?

7          MS. ROTZ:  Not that I know of.

8          THE COURT:  Okay.

9          MS. ROTZ:  But, of course, my kids don't tell me

10   everything.  But as much as I'm aware, no.

11         THE COURT:  How long have you lived in the home you're

12   living in?

13         MS. ROTZ:  I've been there about 14, 15 years.

14         THE COURT:  And what is your source of income now?

15         MS. ROTZ:  I'm on disability.

16         THE COURT:  And what type of disability are you on?

17         MS. ROTZ:  It's from a back injury and back surgeries.

18   It's just --

19         THE COURT:  Are you on social security disability?

20         MS. ROTZ:  Yes.

21         THE COURT:  And how long have you been on that social

22   security disability?

23         MS. ROTZ:  A little -- I think three years, three and

24   a half years maybe.

25         THE COURT:  Is that your primary source of income?

```
 1          MS. ROTZ:  Yes.  But everything I have is paid for.
 2    My house is paid for.  My car is paid for.  Everything in the
 3    house is paid for.  I don't have any debt at all, no credit
 4    cards.  The only bill I have is my monthly electric, you know,
 5    things like that.
 6          THE COURT:  How are you going to be able to -- if I
 7    were to let your daughter go -- and like I say, I don't know
 8    what I'm going to do.  I just need to get these questions
 9    answered.
10       How are you going to be able to support your daughter?
11    She's not going to be able to leave.  She'll have to stay in the
12    house the whole time.  She won't be able to work.  How will you
13    be able to support your daughter?
14          MS. ROTZ:  Well, like I said, I don't have any
15    expenses other than a little bit of groceries and a little bit
16    of gas money.  Everything I have is paid for.  I don't have any
17    outstanding bills except for a small doctor bill.  We may not be
18    eating steak every night, but we will be eating.  I can provide.
19       I was a single parent for most of my life with four
20    children, and nobody went without anything.  That's one of the
21    reasons I didn't graduate.  I got married when I was 16.  And I
22    may not have graduated, but I have at my age become
23    knowledgeable, you know, through myself.
24          THE COURT:  Why don't you tell me why you think you'd
25    be a good person to take care of your daughter.
```

1          MS. ROTZ:  Well, I'm her mom, and I know her better

2     than anybody.  I know how her heart is.  I know what she's

3     thinking sometimes even before she knows what she's thinking.

4     And I have seen her with my grandchildren.

5          I know Billi Jo would never ever be a flight risk because

6     she would not -- she wants all this done, and she would never

7     ever -- if I was to put my house up or be responsible like for

8     any of this, she would never ever do that to me.  She would

9     never leave.  She would abide by everything the Court says, as I

10    would.  And not only because of the financial part of it, but

11    because Billi Jo is innocent.

12         She needs to come home.  She needs to be with her church

13    members.  We need to focus on who did this to our family.

14         And I'm not a very good speaker in front of people, so

15    that's why every time I have to come up here I go through what

16    I'm going through now.  But all I can say from my heart is Billi

17    Jo -- and I'm not just saying this because I'm her mom.  I'm not

18    the kind of mom that thinks all my kids are perfect.  I'm the

19    kind of mom that right is right and wrong is wrong.  And I would

20    not be standing here willing to put up everything I own or

21    borrow the money or do anything if I didn't know in my heart

22    that Billi Jo did not do this.

23         And she needs to come home with her family so we can all get

24    strong together as a unit so that when we do go to trial, we

25    will have our second wind and we can get through this again.

```
 1              THE COURT:  Let me ask you about your home.  What
 2    would you say the value of your home is?
 3              MS. ROTZ:  Probably about 68 or 72 thousand.  It's a
 4    small older home.  It was built in the -- I think it was 1971.
 5    And I live right next door to my cousin, my first cousin, which
 6    her husband just retired from the police department.  So there's
 7    very strong ties.  We have coffee every day.  We're within
 8    walking distance to each other's yards.
 9              THE COURT:  Remind me.  You say you attend church.
10    Where do you-all attend church?
11              MS. ROTZ:  Pardon?
12              THE COURT:  Where do you-all attend church?  Where do
13    you attend church?
14              MS. ROTZ:  Oh, Christian Renewal in Brunswick,
15    Georgia.
16              THE COURT:  Have you gone there for a while?
17              MS. ROTZ:  Yes.  I have to say, though, since this has
18    been going on with my health and different things, I haven't
19    gone like every Sunday like I usually do, but I stay in contact
20    over the phone, you know, with the members and the pastor.
21              THE COURT:  Is it close to your home?  Is it in the
22    same community?
23              MS. ROTZ:  Oh, yes, yes.  Maybe seven miles,
24    eight miles.  The town we live in is small.
25              THE COURT:  How big is Brunswick?
```

```
 1            MS. ROTZ:  I don't know how big.

 2            THE COURT:  Just guess.

 3            MS. ROTZ:  Well, it's really smaller than this town.

 4    Really, I don't know.

 5            THE COURT:  Five thousand, 10,000 people?

 6            MR. HERRIN:  About 60,000.

 7            MS. ROTZ:  Sixty thousand.

 8            THE COURT:  Sixty thousand?

 9            MS. ROTZ:  Yeah.

10            THE COURT:  Where is it located?

11            MS. ROTZ:  In Brunswick, Georgia.  Have you heard of

12    St. Simons Island, Jekyll Island?

13            THE COURT:  Uh-huh.  Down in that area?

14            MS. ROTZ:  Uh-huh.

15            THE COURT:  All right.  Thank you, ma'am.

16            MS. ROTZ:  Thank you.

17            THE COURT:  Well, I often say this; that is, the issue

18    of detention and incarceration are the very toughest things that

19    the Court has to do.  And I guess the reason I say that

20    frequently when you have hard cases is because it is the

21    toughest thing we do.  It just happens to be the truth.

22       I don't know what I'm going to do yet.  However, there are

23    some more things I need to look into.  I think both parties have

24    acknowledged there's been some shift than where we were before,

25    and I want to evaluate that a little bit more.  I have a pretty
```

1    good feel for it.  I also want to evaluate the facts and

2    circumstances that I've heard here and to make sure that I have

3    the accuracy of everything we're talking about.

4        And then I'll issue an opinion shortly.  It may take a few

5    weeks for me to do that because there's going to be some

6    investigation we'll need to do to determine certain things.  So

7    I can't tell you what I'm going to do.  I can just tell you

8    we'll be working on it and we'll be working on it diligently.

9    As soon as I have the answers to the questions that I've

10   submitted to some folks, then we'll make a written decision.

11       I want to emphasize again I don't know what I'm going to do,

12   so I don't want to raise any false hopes on either side.  But

13   I'm going to have the parties, because they're here, execute

14   some documents should I decide to release the defendant.  I'm

15   going to have them go on and execute those documents so they do

16   not have to make another trip to Louisville to do that.

17       Ma'am, that doesn't mean that's what I'm going to do.  I'm

18   just doing it so that if that's what I decide to do that we've

19   got the paperwork in order for it to happen and so the family

20   members don't have to make another trip up here for that --

21   solely for that purpose and have another court hearing solely

22   for that purpose.

23       And in that regard, I just want to make sure if I were to

24   decide to release Ms. Smallwood, I want to -- Ms. Rotz, if we

25   were to place -- if I were to place a condition on you that I

1   would probably -- if I were to release your daughter to your

2   custody, I would be -- there would be certain conditions she

3   would have.  I would allow her probably to visit with her child,

4   but they would be visits of no longer than four hours, and you'd

5   have to be present during the whole time of those visits.

6       Would you abide by that if that was a condition given to

7   you?

8           MS. ROTZ:  Yes.

9           THE COURT:  Okay.  Also, if I were to release her, I'd

10  ask you to sign for the property bond, and you'll have to give

11  the address and all that to the clerk's office downstairs if I

12  were to do that.

13      I want you-all to understand, too, I don't know what I'm

14  going to do.  I can't tell either side that too many times.  All

15  right?

16      All right.  Ms. Smallwood, let me just explain some things

17  to you.  If I were to release you, there would be certain

18  conditions, ma'am, that you'd have to comply with.  I want to

19  make sure that you understand those now if I were to do it and

20  to tell me whether or not you will comply with those conditions.

21      Of course, you'd have to report to the probation office as

22  directed by them.  Another issue is, too, that not every

23  probation office will accept releases, so that is an issue here

24  too.

25      You'd have to surrender -- do you have a passport?

1        THE DEFENDANT:  No, sir.  Sorry.  I mean, I did have

2  one, but I lost it in the -- you know, I don't presently -- I

3  don't physically have one, but there's one in the system.

4        THE COURT:  If you have one, you need to surrender it

5  to --

6        THE DEFENDANT:  No, no.

7        THE COURT:  -- the probation office.

8        THE DEFENDANT:  It was ruined in the house.

9        THE COURT:  Oh, did it burn in the house?

10        THE DEFENDANT:  I just mean it's probably in a system

11  that I did have one at a time.  In the government system.

12        THE COURT:  If you were to be released to your mother,

13  you would have to -- your place of abode and travel would be

14  restricted to your mother's home in Brunswick, Georgia, and to

15  the Western District of Kentucky for court appearances and for

16  visits to your attorney.  And you'd have to give prior notice of

17  any such visits and appearances to the probation office with

18  dates and times for their approval before going.

19    You'd have no contact with your husband, no unsupervised

20  contact with your child.  Visitation would be coordinated

21  through -- with notice to the probation office and notice to

22  Ms. Rotz, and Ms. Rotz would have to be present for those

23  visits.  And they could be no longer than four hours at a time

24  and could be no overnight visits.

25    You may be required to undergo any medical or psychiatric

1    treatment, or you may be required to undergo or obtain medical

2    health assessment and attend any treatment designated by the

3    probation office.

4        You must refrain -- you may not possess a firearm,

5    destructive device, or dangerous weapons.

6        Ms. Rotz, if there are any dangerous weapons of any type in

7    your home, they have to be removed.

8            MS. ROTZ:  No.

9            THE COURT:  Okay.  By that, I mean firearm.  I know

10   you may have some other types of utensils, but firearms.

11       You may not use any alcohol.  You may not use or unlawfully

12   process any narcotic drug or substance, as defined by federal

13   law, unless you happen to have a licensed medical practitioner's

14   prescription for some controlled substance.  And if you do,

15   you'd need to notify probation of that.

16       You'll be required to submit to any testing required by

17   pretrial services office or the supervising officer to determine

18   whether you're using a prohibited substance.  Any testing may be

19   used with random frequency and include urine testing, the

20   wearing of a sweat patch, remote alcohol testing system, or any

21   other form of testing that the probation officer may suggest.

22       And you must refrain from obstructing or attempting to

23   obstruct or tamper in any fashion with the efficiency and

24   accuracy of any prohibitive substance testing or monitoring,

25   which will be set forth in the -- and required by any condition

1    of release if you were to be released.

2        You will participate in a program of inpatient or outpatient

3    substance abuse therapy and counseling if probation considers it

4    advisable.

5        You will be placed on home incarceration for 24-hour

6    lockdown.  Another issue is that I think where she goes will

7    have to be compatible with a GPS preferably, possibly an ankle

8    bracelet but GPS probably, which is what they call active global

9    positioning satellite.

10       As I said, any visitation with your child will be limited to

11   four hours per day with no overnight visits.  You'll have no

12   contact with your husband and will not go on the Fort Campbell

13   military base unless your attorneys feel they need to go there

14   for some reason involved in the defense of the case and will

15   receive prior approval from probation before you do that.  And

16   the probation can contact me in that regard.

17       You'll notify us if you have any contacts from your husband.

18       Ma'am, do you understand those conditions?  And there may be

19   others.  Do you understand those conditions?

20            THE DEFENDANT:  Yes, sir.

21            THE COURT:  And there may be others.  Would you abide

22   by all those conditions?

23            THE DEFENDANT:  Yes, sir.

24            THE COURT:  Do you understand if you don't abide by

25   all those conditions, there are penalties that can result?

1      THE DEFENDANT:  Yes, sir.

2      THE COURT:  You can be placed in jail for

3  additional -- for a period of time for not abiding by those

4  conditions.  Do you understand that?

5      THE DEFENDANT:  I'm sorry.  I'm having --

6      THE COURT:  If you don't abide by those conditions,

7  you'll be incarcerated again.  Do you understand that?

8      THE DEFENDANT:  Oh, yes, I understand.

9      THE COURT:  And there could be fines, also.  Do you

10  understand that?

11      THE DEFENDANT:  Yes.

12      THE COURT:  I think up to a $250,000 fine.  Do you

13  understand that?

14      THE DEFENDANT:  Yes, sir.

15      THE COURT:  Well, as I said, I'm not sure what I'm

16  going to do yet.

17    Yes, ma'am?

18      MR. HERRIN:  Your Honor?

19      THE COURT:  Yes, Mr. Herrin?

20      MR. HERRIN:  I'd like to take upon this time to

21  present to the Court, also.

22      THE COURT:  Yes, sir.

23      MR. HERRIN:  I'm Billi Jo's stepfather, William

24  Herrin.

25      THE COURT:  Yes, sir.

1      MR. HERRIN:  If it please the Court, I also have an

2  additional property I'd like to put up in the event that it

3  would meet or at least contribute toward her bond.

4      THE COURT:  That'll be fine, and we'll put your name

5  on the bond, too.  All right, sir?

6      MR. HERRIN:  All right.  Thank you.

7      THE COURT:  Thank you, sir.

8  All right.  Anything else on behalf of the United States at

9  this time?

10      MR. LESOUSKY:  No, sir.

11      THE COURT:  On behalf of the defendant?

12      MS. WYROSDICK:  No, sir.  Thank you.

13      THE COURT:  All right.  As soon as I have some of my

14  questions answered, I'll let you-all know as soon as -- I'm

15  going to try to get it done in the next few days.  That's my

16  goal, but there's some possibility that that won't occur.  Just

17  depends on how much investigation we have to do.  We have to

18  check on the capabilities of districts to handle -- if I should

19  release, if they have the capabilities, if that is my decision,

20  to do the type of monitoring that that will require, frankly.

21  All right.  Thank you-all very much, and I'll let you know

22  something as soon as I have all the information.

23      MR. LESOUSKY:  Thank you, Judge.

24      THE COURT:  Somebody from probation -- Ms. Wyrosdick?

25      MS. WYROSDICK:  Yes, Your Honor.

1          THE COURT:  Somebody from probation -- I mean, not

2    from probation.  Someone from probation's here.  Also, someone

3    from -- one of the clerks is going to come up and will meet

4    you-all here in the courtroom in just a minute and will meet

5    with Ms. Rotz and Mr. Herrin with the bond papers they need to

6    sign and show them where the clerk's office is and help them

7    with the executing of those preliminary documents.

8       Okay?

9          MS. WYROSDICK:  Yes, sir.  Thank you.

10          THE COURT:  Thank you.

11    (Proceedings concluded at 11:13 a.m.)

12

13                    C E R T I F I C A T E

14       I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM

15    THE RECORD OF THE PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

16

17       s/Terri L. Turner                    December 7, 2010
      Registered Merit Reporter            Date
18    Official Court Reporter

19

20

21

22

23

24

25

1                          I N D E X

2      WITNESS FOR THE DEFENDANT:

3      REBECCA ROTZ
           Direct Examination by Ms. Wyrosdick - page 3
4
       STEPHANIE HAMLIN
5          Direct Examination by Ms. Wyrosdick - page 8

6      WAYNE SMALLWOOD
           Direct Examination by Ms. Wyrosdick - page 11
7          Cross-Examination by Mr. Lesousky - page 13

8      CHARLES LEPPERT
           Direct Examination by Ms. Wyrosdick - page 20
9
       Argument by Ms. Wyrosdick - page 25
10     Argument by Mr. Lesousky - page 28

11

12     Reporter Certificate - page 47

13

14

15

16

17

18

19

20

21

22

23

24

25