UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CRIMINAL ACTION NO. 5:08-CR-00038-TBR

BILLI-JO SMALLWOOD                                         MOVANT/DEFENDANT

v.

UNITED STATES OF AMERICA                             RESPONDENT/PLAINTIFF

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

This matter is before the Court upon Movant's amended motion and supplement to vacate, set aside, or correct sentence pursuant to 28 U.S.C. § 2255 (Docket Numbers (DN) 264 and 265). The United States has responded in opposition to the amended motion and supplement (DN 280), and Movant has replied (DN 283). The Court referred this matter to the undersigned Magistrate Judge for report and recommendation pursuant to 28 U.S.C. § 636. DN 268.

Because Movant's claims are without merit, the Magistrate Judge RECOMMENDS that the Court DENY Movant's amended motion and supplement pursuant to 28 U.S.C. § 2255 (DN 264 and 265) and DECLINE to issue a certificate of appealability.

### Movant's claims

On two occasions, Movant completed and submitted identical versions of a Court-approved form styled: Amended Motion Under 28 U.S.C. § 2255 To Vacate, Set Aside, Or Correct Sentence By A Person In Federal Custody. DN 264 and 265. In the form, Movant identifies her claims in somewhat generic and conclusory fashion as ineffective assistance of counsel at investigation stage, plea stage, trial, and sentencing.

The substance of Movant's claims are in the supplemental materials at DN 265-1 and 265-2. The materials at DN 264-3 are incorporated into and subsumed under those at DN 265-1 and 265-2.

Movant identifies 12 claims (in her own words):

1

1. Grand jury errors.  DN 265-1, pp. 3-11 of 25.

2. False statements and omissions before the grand jury.  pp. 12-13.

3. Expert witnesses / testimony.  pp. 14-15.

4. Offer to stipulate.  pp. 16-19.

5. Prosecutorial misconduct, closing arguments.  pp. 20-23.

6. Failure to investigate and prepare.  p. 24.

7. Failure to properly instruct or inform Defendant regarding options and legal strategy.  Duty to consult.  p. 25.

8. Waiver of appeal.  DN 265-2, pp. 1-3 of 17.

9. Failure to mount an affirmative defense or theory.  pp. 4-8.

10. Government misconduct, prosecutorial misconduct, and abuse of discretion.  pp. 9-15.

11. Constitutional rights which have been violated.  p. 16.

12. Defendant's top end of the applicable Guideline was not life.  p. 17.

The Court has determined that the following claims are conceptually related and, therefore, most efficiently analyzed as a group:  Claims 1 and 2; Claims 5 and 10; Claims 6, 7, and 9; and Claims 8 and 12.  Claim 11 is conclusory and not based on any supporting facts.

**1 and 2.  Movant's claims concerning false statements, omissions, and other errors in the prosecution's case before the grand jury lack a factual basis, are without merit, and are procedurally defaulted.**

In November, 2008, the first grand jury returned an indictment charging that, in May, 2007, Movant maliciously damaged and destroyed by means of fire a residential facility located on Fort Campbell military base and that, as a result, Movant directly and proximately caused the deaths of her nine-year old son and two-year old daughter.  18 U.S.C. § 844(i).

2

Alcohol, Tobacco, and Firearms (ATF) Agent Kurt Thielhorn testified that the post-fire evidence indicated that the doors leading outside the two-story residence were locked from within and the windows were secured, indicating that there had been no forced entry. The United States' arson expert, John DeHaan, Ph.D., testified that the forensic evidence was consistent with the residence being closed and secured from inside during the fire.

Subsequent evidence was discovered, indicating that, in fact, the first-floor dining room window, where the fire originated, was open and the screen cut.

In September, 2010, a second grand jury returned a superseding indictment. Dr. DeHaan did not testify, and Agent Thielhorn informed the grand jury about the open window.

Movant claims that the United States engaged in prosecutorial misconduct and that counsel was ineffective for failing to move to dismiss the initial and superseding indictments.

In light of the superseding indictment, any error with respect to the initial indictment was, at worst, harmless error because the Double Jeopardy Clause of the Fifth Amendment does not bar a grand jury from returning a subsequent indictment. *United States v. Williams*, 504 U.S. 36, 49 (1992). Jeopardy does not attach and the prohibition against double jeopardy can have no application until a defendant is "put to trial." *Serfass v. United States*, 420 U.S. 377, 388 (1975).

As to the subsequent indictment, there was no error in light of Agent Thielhorn's revised testimony.

Movant's position fails to take into account the court-independent, non-technical nature of grand jury proceedings and the relatively low bar set by the requirement that the grand jury find probable cause that a crime was committed. In light of "the grand jury's singular role in finding the probable cause necessary to initiate a prosecution," courts generally lack authority "for looking into and revising" the grand jury's judgment. *Kaley v. United States*, 134 S.Ct. 1090, 1097-98 (2014). "[T]he government [] has no judicially enforceable duty to provide a grand jury with exculpatory evidence."

3

*United States v. Williams*, 504 U.S. 36, 47 (1992). "The mere fact that evidence itself is unreliable is not sufficient to require a dismissal of the indictment, and [] a challenge to the reliability or competence of the evidence presented to the grand jury will not be heard." *Id.* at 54.

There is an outer limit of acceptable prosecutorial conduct before the grand jury without judicial intervention. See, for example, *United States v. Burke*, 425 F.3d 400, 412 (7th Cir.2005) (pre-trial dismissal of indictment required where prosecution's case consisted of knowingly perjured testimony). However, it is immaterial whether the outer limit was reached in this case because "any error by the prosecution before the grand jury is harmless because [Movant] was subsequently convicted by the petit jury." *United States v. Cobleigh*, 75 F.3d 242, 251 (6th Cir.1996) citing *United States v. Mechanik*, 475 U.S. 66, 71-73 (1986).

Alternatively, Movant's claim is procedurally defaulted because she chose not to file a direct appeal, in which she could have raised the matter. A § 2255 motion "is not a substitute for a direct appeal." *Regalado v. United States*, 334 F.3d 520, 528 (6th Cir.2003). A federal habeas court generally will not consider a claim that could have been raised on direct appeal. *Bousley v. United States*, 523 U.S. 614, 622 (1998).[1]

Movant's first and second claims concerning false statements, omissions, and other errors before the grand jury lack a factual basis, are without merit, and are procedurally defaulted.

**3. Counsel's decision not to call a "fire" expert to rebut the testimony of the prosecution's expert is entitled to a presumption of sound trial strategy.**

Movant's third claim is that counsel was ineffective for failing to call a "fire" expert to rebut the findings of the United States' expert, Dr. DeHaan. Prior to trial, counsel investigated and consulted with

---

[1] Actually, Movant's claim was procedurally defaulted even prior to her not filing a direct appeal. In *United States v. Combs*, 369 F.3d 925, 936 (6th Cir.2004), Combs attempted to raise a grand-jury error claim upon direct appeal and the Sixth Circuit held that he had "forfeited this issue by not raising it before trial" in a motion to dismiss the indictment.

two fire experts, Dr. Ronald Gronemeyer and Doug Carpenter, but decided not to call them. Counsel is entitled to a presumption that her decision was sound trial strategy.

*Strickland v. Washington*, 466 U.S. 668 (1984) established that the Sixth Amendment entitles defendants to effective assistance of trial counsel and that counsel is ineffective if she performed deficiently and the deficient performance was prejudicial. However, "the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689.

Following *Strickland*, the lower courts generally held that counsel's decision not to call an expert to rebut the prosecution's expert is sound trial strategy. See, for example, *Boyle v. McKune*, 544 F.3d 1132, 1139 (10th Cir.2008) ("decision of which witnesses to call is quintessentially a matter of strategy for the trial attorney") and *Bower v. Quarterman*, 497 F.3d 459, 467 (5th Cir.2007) ("An early formulation of trial strategy and a decision to attack the state's expert witnesses on cross examination rather than calling additional experts can be a part of a reasonable trial strategy").

In *Harrington v. Richter*, 131 S.Ct. 770, 791 (2011), the Supreme Court approved of the foregoing approach of evaluating counsel's decision to focus on cross-examination rather than call a rebuttal witness within the framework of overall trial strategy:

> ... *Strickland* does not enact Newton's third law for the presentation of evidence, requiring for every prosecution expert an equal and opposite expert from the defense.
>
> In many instances cross-examination will be sufficient to expose defects in an expert's presentation. When defense counsel does not have a solid case, the best strategy can be to say that there is too much doubt about the State's theory for a jury to convict. Here Richter's attorney represented him with vigor and conducted a skillful cross-examination. As noted, defense counsel elicited concessions from the State's experts and was able to draw attention to weaknesses in their conclusions stemming from the fact that their analyses were conducted long after investigators had left the crime scene. For all of these reasons, it would have been reasonable to find that Richter had not shown his attorney was deficient under *Strickland*.

The United States persuasively argues that counsel did not perform deficiently: "Defense counsel conducted a scathing cross examination of the government's fire expert [Dr. DeHaan], and could

5

reasonably have believed that they were in a better strategic position by not calling their own experts who were potentially also subject to damaging cross examination." DN 280, p. 280.

In addition, Movant has failed to allege or prove that any deficient performance was prejudicial. She has not indicated what exactly she believes a rebuttal expert would have testified to that would have resulted in a reasonable probability of a not guilty verdict.

All of the cases that the Court has uncovered in which trial counsel's failure to call an expert rebuttal witness was deemed ineffective have a common thread that does not apply in this case: Counsel's ineffectiveness actually pre-dated her trial performance and consisted of an inadequate investigation in which an expert opinion was not obtained on an essential, open question.[2] "Where counsel fails to investigate and interview promising witnesses, and therefore has no reason to believe they would not be valuable in securing defendant's release, counsel's inaction constitutes negligence, not trial strategy." *Stewart v. Wolfenbarger*, 468 F.3d 338, 356 (6th Cir.2006) (internal quotations omitted).

The decision not to obtain/call a rebuttal expert may or may not be sound strategy.

In *Richey v. Bradshaw*, 498 F.3d 344 (6th Cir.2007), counsel was ineffective for not obtaining a rebuttal arson expert who would have challenged the government expert's opinion that the fire was arson as opposed to accident.[3] Due to the nearly insurmountable circumstantial evidence that Richey set the fire, the lack of a rebuttal expert rendered Richey a "sitting duck." In *Babick v. Berghuis*, 620 F.3d 571 (6th Cir.2010), in contrast, counsel was effective although she did not secure an expert who might have rebutted the government's arson expert because the evidence tying Babick to the fire was relatively weak and there was no reason to question the state expert's findings.

---

[2] If counsel consults with no expert prior to trial, she obviously will have no expert to call at trial to rebut the prosecution's expert.
[3] During post-conviction proceedings in *Richey*, two arson experts testified that, if asked, they would have been willing to challenge the state expert's findings. In addition, Richey's counsel had reason to know that the fire might have been an accident in light of certain "holes" in the prosecution's arson theory.

6

Here, counsel obtained two fire-expert opinions prior to trial.  Unlike the defense attorney in *Richey*, supra, counsel was not in the dark about critically-important information within the purview of the experts.  Counsel's decision not to call a rebuttal fire expert is entitled to a presumption of sound trial strategy.

**4. Counsel's stipulation that the cause of death of the children was smoke inhalation was sound trial strategy.**

Army pathologist Eric Berg testified that the cause of death of the children was thermal and smoke inhalation injuries suffered in the fire.  Dr. Berg performed an autopsy on Movant's son and discovered blunt force trauma to the head and laceration injuries to the chest.  DN 207, p. 128.  Although these injuries did not contribute to the cause of death, Dr. Berg could not determine whether they resulted from the fire or occurred beforehand.  Counsel declined to cross-examine and stipulated to "the manner of death in the manner described by the doctor."  DN 207, p. 129.

Movant claims that counsel was ineffective for stipulating with respect to the cause of death, which allegedly resulted in an enhanced sentence.  The argument is without merit and lacks a factual basis because Movant's enhanced sentence was based on the jury's determination that her malicious arson "directly and proximately caused the deaths of Sam Fagan and Rebekah J. Smallwood."  Jury instructions, DN 193, p. 5.

Proximate causation is a legal concept, whereas cause of death is a medical one.  The precise cause of death is legally irrelevant so long as the deaths were proximately caused by Movant's arson-conduct.  Counsel did not stipulate as to proximate cause.

In addition, counsel's decision to stipulate was sound trial strategy.  There was nothing to be gained by refusing to stipulate to the cause of death.  On the other hand, as the United States points out, there was much to lose by not stipulating.  DN 280, p. 13.  Specifically, there was an increased risk that the Court would permit the United States to introduce into evidence gruesome photographs of the

7

deceased victims' bodies. Instead, following stipulation, the Court ruled that the prejudicial impact outweighed the probative value. DN 207, pp. 7-8.

**5 and 10. Movant's claims of prosecutorial misconduct are procedurally barred.**

Movant claims that her trial was marred by innumerable instances of prosecutorial misconduct. The main ones argued by Movant appear to be that prosecutorial misconduct occurred when: 1) during closing argument, the United States insinuated that she was motivated to kill her husband, Wayne Smallwood (who was in the residence when the blaze commenced), because she was the direct beneficiary of a $400,000 Army life insurance policy, 2) during closing argument, the United States repeatedly referred to her allegedly telling investigators that she saw "blue flames,"[4] and 3) at trial, the United States (presumably inadvertently) showed jurors a picture of a knife recovered from the scene of the fire.[5]

In denying Movant's motion for a new trial, this Court found that there was no prosecutorial misconduct with respect to the life insurance policy because the United States' statements were neither improper nor flagrant. DN 247, pp. 5-7 applying *United States v. Carroll*, 26 F.3d 1380 (6th Cir.1994). The Court further found that, although improper, the "brief display of the picture of the knife worked no prejudice on the Defendant and was not error of sufficient magnitude to warrant a new trial." DN 247,

---

[4] According to the prosecution's theory of the case, Movant's seeing blue flames provided circumstantial evidence that she set the fire for the following reasons: The Smallwood residence had an upstairs and a downstairs. The fire began downstairs. According to prosecution witnesses, Movant told investigators that, as she came down the stairs, she saw the fire and described it as a "creek of fire" accompanied by "blue flames." DN 245, p. 17. On two subsequent occasions, Movant told investigators that she saw or may have seen blue flames. Dr. DeHaan testified that, when a gas-vapor fire is ignited, a blue flame front extends out in all direction at approximately 10 feet per second due to the fire's rapid consumption of the vapor. Blue flames are transitory and observable for only a few second after ignition. The blues flames are followed by the yellow flames normally associated with fire. Movant's seeing blue flames indicates that she was present within seconds of the fire's ignition.

[5] The Court had previously excluded tool-mark evidence that the knife was used to vandalize the Smallwood's car, and the Sixth Circuit affirmed. *United States v. Smallwood*, 2012 WL 171402. Movant claims that the picture was prejudicial because it left an impression that was suggestive of the excluded evidence.

p. 5.[6] In denying Movant's motion for judgment of acquittal, the Court found that the "blue flames" evidence supported Movant's conviction. DN 245, pp. 16-20.

For prosecutorial misconduct to rise to the level of a constitutional violation, it must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). In light of the Court's prior findings, Movant is unable to establish any prosecutorial misconduct rising to the level of a denial of due process. Movant's claims are precluded by law-of-the-case doctrine.

Alternatively, Movant's prosecutorial misconduct claims are procedurally defaulted due to lack of contemporaneous objection and because they could and should have been raised in Movant's motion for a new trial and/or in a direct appeal, which she chose not to file. See *Kidd v. United States*, 2013 WL 6795977 (E.D.Tenn.) ("Because Movant failed to raise his prosecutorial misconduct claim at the district court level or on direct appeal, his claim is procedurally defaulted") and *Besser v. United States*, 2013 WL 308951 (W.D.Mich) ("[T]his [prosecutorial-misconduct claim] is procedurally defaulted because neither Movant nor his trial counsel made any objections during the government's closing argument. Moreover, given the significant evidence against Movant, he could not establish actual prejudice, as necessary to cure the default").

While Movant's claims with respect to the life insurance policy and the knife picture are clearly precluded by the Court's prior findings, her blue-flames claim arguably is not because her present focus is not the evidence itself (resulting in denial of the motion for judgment of acquittal) but rather the prosecution's characterization of the evidence in its closing argument.

While it remains the case that the claim is procedurally barred for failure to raise it sooner, it is also without merit. Movant contends that she did not unequivocally tell investigators that she saw blue

---

[6] The offending photograph: "was removed ... and was never introduced into evidence for examination by the jury ... was displayed to the jury for less than fifteen seconds during a two-week trial ... no evidence or testimony connected the knife and the vehicle [and] it was never mentioned or displayed against during the course of the trial." DN 247, pp. 4-5.

flames and that the prosecution's repeated assertion to the contrary in closing argument mischaracterized the evidence and constituted prosecutorial misconduct.

The prosecution is entitled to characterize or "summarize[] the evidence, although subject to conflicting inferences, in a manner that supported its theory of the case." *United States v. Kuehne*, 547 F.3d 667, 690 (6th Cir.2008). Prosecutors may not misstate the evidence, *United States v. Carter*, 236 F.3d 777, 784 (6th Cir.2001), or argue facts not in evidence, *Abela v. Martin*, 380 F.3d 915, 929 (6th Cir.2004), but they have "leeway to argue reasonable inferences from the evidence during closing arguments." *United States v. Crosgrove*, 637 F.3d 646, 664 (6th Cir.2011).

The jury heard the actual evidence concerning the blue flames, and any characterization of that evidence fell within legitimate prosecutorial leeway.

Movant raises a plethora of claims and allegations – too numerous to analyze in detail. She alleges that the prosecution left the jury with the false impression that: 1) the burns she suffered, predominantly on the front of her legs, were necessarily incompatible with her version of events in which she remained upstairs and exited through an upstairs window; 2) she, not her husband, removed the smoke detectors; 3) her decision to purchase a gas can and gas within hours of the fire was spontaneous as opposed to a rational response to receipt of a notice to cut the grass or be fined and express instructions from her husband to purchase these items.

All of Movant's claims of prosecutorial misconduct are procedurally barred.

**6, 7, and 9. Counsel was not ineffective for declining to investigate and pursue speculative theories and defenses that Movant appears to have formulated in hindsight after her conviction.**

Movant complains that the investigation focused early on upon her and Wayne as suspects, to the exclusion of third parties. She claims that counsel was ineffective for declining to investigate and affirmatively place in the jury's mind alternative, third-party scenarios of who set the fire and why – rather than simply attempting to poke holes in the prosecution's case.

Movant's first suggestion is that someone was angry at Wayne and wanted revenge. This individual allegedly vandalized the family vehicle, cut the screen of the dining room window, entered through the window, poured gasoline throughout the first floor, exited the window, and set the house on fire by throwing a firecracker through the open window or using a flare gun.

Although not entirely clear, Movant's second suggestion appears to be that someone returned to the unsecured crime scene, poured the gasoline, and planted an incriminating gas can nozzle in order to frame her.[7] Among the persons who may have had a motive to frame Movant were: 1) a jealous girlfriend or ex-girlfriend of Wayne who wanted to get Movant and her children out of the "way," and 2) a rogue individual acting on behalf of Fort Campbell fire and rescue who wanted to divert attention away from the allegedly slow rescue efforts that resulted in the deaths.

Counsel cannot be fairly faulted for not investigating and pursuing these theories more vigorously because, in addition to being speculative to far-fetched, there is no indication that Movant suggested them as her preferred defense or that Movant gave counsel any supporting, concrete leads, clues to follow up on, names of possible suspects or witnesses, friends who might know something about jealous ex-girlfriends, Fort Campbell insiders who might be willing to talk, etc.

The duty to investigate does not extend beyond an "obligation to investigate all witnesses who may have information concerning his or her client's guilt or innocence." *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir.2005).

Movant's claim that counsel failed to place these possible scenarios in the minds of jurors lacks a factual basis. In her summation, counsel eloquently argued that, early on in his investigation, Agent Thielhorn conveniently and exclusively focused on the Smallwoods, going so far as to tell the first grand jury that all the doors and windows were locked from the inside, when that turned out to be false:

---

[7] The prosecution presented evidence that Movant purchased a Blitz-brand gas can the afternoon before the fire and notwithstanding the fact that the Smallwoods already owned two gas cans, which were stored in a shed behind their residence. The gas can nozzle recovered from the scene of the fire matched the type of nozzle on the can Movant purchased.

11

> **Counsel:** Why is that important? Because [Agent Thielhorn] tells the grand jury that if all the doors and windows are locked, it has to be Mr. or Ms. Smallwood that's done the crime. ... When you open the window of the Smallwood residence before the fire, you open a world of suspects that apparently was too much trouble for Kurt Thielhorn to even investigate. (DN 211, p. 64).

In addition, counsel reminded the jury that a neighbor reported seeing someone running from the scene, which supports the scenarios suggested by Movant. DN 211, p. 55.

Counsel's primary defense strategy was to highlight weaknesses in the prosecution's case, which was legally adequate and reasonable in light of the practically non-existence evidence in support of a more affirmative approach. Counsel was not ineffective for declining to investigate and pursue speculative theories and defenses that Movant appears to have formulated in hindsight after her conviction.

**8 and 12. Movant has failed to show that counsel's advice, which may have influenced Movant's decision not to file a direct appeal, was ineffective.**

Movant asserts that counsel advised her that, while it was ultimate her decision whether to instruct counsel to file an appeal on her behalf, she should be aware that, if she did file an appeal, there was a reasonable likelihood that the United States would file a cross-appeal of the 25-year sentence imposed by the Court and this would expose her to a possible life sentence.[8] Movant claims that this advice, which influenced her decision not to file an appeal, was ineffective.

The United States' position is that this advice was sound and that "[h]ad Smallwood taken a direct appeal of her conviction, the United States would likely have sought authorization from the Solicitor General to cross-appeal the downward departure and the sentence imposed." DN 280, p. 17.

At the sentencing hearing, the Court explained that Movant's advisory sentence under the United States Sentencing Guidelines (U.S.S.G.) was life because violations of 18 U.S.C. § 844(i) are sentenced under U.S.S.G. § 2K1.4. Sentencing hearing, DN 253, p. 29. "If death resulted, or the offense

---

[8] Although the Court record does not include an affidavit from counsel, the United States does not dispute Movant's version of counsel's advice.

was intended to cause death or serious bodily injury, apply the most analogous guideline from Chapter Two, Part A." U.S.S.G. § 2K1.4(c)(1). The analogous provision contemplated by § 2K1.4(c)(1) is § 2A1.1. DN 253, p. 63 citing *United States v. Guzman*, 603 F.3d 99, 111 (1st Cir.2010). Section 2A1.1 covers sentencing for first-degree murder under 18 U.S.C. § 1111. Movant's Guidelines sentence under § 2A1.1 was life. DN 253, p. 65. However, the Court proceeded to apply a downward departure pursuant to U.S.S.G. § 2A1.1, cmt. n. 2(b) ("felony murder"), ultimately sentencing Movant to 25 years. DN 253, p. 64. The United States objected to the downward departure. DN 253, p. 75.

On appeal, the United States could have challenged the Court's downward departure on the ground that Movant, like Guzman, "was chargeable with having intended the predictable consequence of [her] actions." *Guzman*, supra. A downward departure arguably was unwarranted because Movant "cause[d] the death intentionally or knowingly" as contemplated by U.S.S.G. § 2A1.1, cmt. n. 2(b):

> **Felony Murder.** -- If the defendant did not cause the death intentionally or knowingly, a downward departure may be warranted. For example, a downward departure may be warranted if in robbing a bank, the defendant merely passed a note to the teller, as a result of which the teller had a heart attack and died. The extent of the departure should be based upon the defendant's state of mind (e.g., recklessness or negligence), the degree of risk inherent in the conduct, and the nature of the underlying offense conduct. However, departure below the minimum guideline sentence provided for second degree murder in § 2A1.2 (Second Degree Murder) is not likely to be appropriate. Also, because death obviously is an aggravating factor, it necessarily would be inappropriate to impose a sentence at a level below that which the guideline for the underlying offense requires in the absence of death.

The deaths that resulted from the arson in this case were arguably more predictable than the above example involving a bank robbery and a heart attack. If the United States had prevailed on this argument on cross-appeal, Movant would have been subject to a possible life sentence.

Absent an explicit instruction to file an appeal, counsel need not file an appeal where, notwithstanding some potentially fruitful claims, the appeal would also entail the significant potential downside of a cross-appeal on the part of the government resulting in the reversal of a downward departure. *Bretan v. United States*, 2008 WL 2622760, *2 (2nd Cir.2008).

Next, Movant argues that counsel's advice was, in fact, unsound because, procedurally, she could not have faced a life sentence as a consequence of filing a direct appeal as a Court may not impose a life sentence absent a jury recommendation to that effect, and there was no such recommendation in this case.

The argument is without merit because it is based upon superseded law. Until 1994, 18 U.S.C. § 844(i) provided:

> Whoever maliciously damages or destroys, or attempts to damage or destroy, by means of an explosive, any building, vehicle, or other real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce shall be imprisoned for not more than ten years or fined not more than $10,000 or both; and if personal injury results shall be imprisoned for not more than twenty years or fined not more than $20,000, or both; and if death results shall also be subject to imprisonment for any term of years, or to the death penalty or to life imprisonment as provided in section 34 of this title.

In 1994, Congress amended this statute by striking the phrase "as provided in section 34 of this title." Pub.L.No. 103–322, § 60003(a)(3)(C). 18 U.S.C. § 34 provided:

> Whoever is convicted of any crime prohibited by this chapter, which has resulted in the death of any person, shall be subject also to the death penalty or to imprisonment for life, if the jury shall in its discretion so direct, or, in the case of a plea of guilty, or a plea of not guilty where the defendant has waived a trial by jury, if the court in its discretion shall so order.

The 1994 amendment to section 34 inserted a period after the phrase "imprisonment for life" and struck the remainder of the sentence. Pub.L.No. 103–322, § 60003(a)(1).

Finally, Movant states that counsel mentioned to her that "there was something call[ed] a § 2255 and that she would hear about it once she went to prison ... it would be a good idea for her to file that § 2255." DN 265-2, p. 2. Movant argues that, even if filing an appeal entailed a substantial risk of increased sentence, it was a risk she would have been willing to take if counsel had properly advised her of the significant benefits of a direct appeal over the present § 2255 motion. "There was no explanation of the changes in standards of review that would be applied in a 2255 Motion [as opposed to a direct appeal] resulting in a lower chance of success," i.e., claims that could have been raised upon direct

appeal are generally defaulted in a § 2255 motion. DN 283, p. 18. Movant insists that she would never have voluntarily and knowingly made any decision, including foregoing a direct appeal, that would have diminished her chances of being vindicated of a crime she did not commit. "When defense counsel advised [Movant] not to appeal, that she was 'supposed to get life,' [Movant] wasn't fearful of a greater punishment – she was terrified of a greater injustice." DN 283, p. 19.

In examining an effectiveness claim based on a failure to file an appeal, the first question is whether the defendant expressly requested that counsel file an appeal on her behalf. "[A] lawyer who disregards specific instructions from the defendant to file a notice of appeal acts in a manner that is professionally unreasonable." *Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000). Where – as here – there were no specific instructions, the question becomes whether counsel consulted with the defendant about the benefits and drawbacks of bringing an appeal. When – as here – there was a consultation, "[c]ounsel performs in a professionally unreasonable manner only by failing to follow the defendant's express instructions with respect to the appeal." *Id.* at 478.

Movant's final claim goes to the adequacy of the consultation. *Flores-Ortega* rejected the suggestion of "detailed rules" for counsel's conduct, instead embracing an objective test designed to ensure that defendants have a fair opportunity to exercise their right to appeal. *Id.* at 480-481.

Movant's claim is unpersuasive because it presupposes a subjective test in which counsel should have been privy to and taken into account Movant's subjective desire to maximize her chances of full vindication regardless of the risks. In effect, Movant is suggesting that, to the list of detailed rules of proper consultation which the Supreme Court has rejected, the Court should add a requirement that counsel include a discussion of the difference in the standard of review of claims presented on direct appeal as opposed to a § 2255 motion.

Movant has failed to show that counsel's advice, which may have influenced Movant's decision not to file a direct appeal, was ineffective.

**Certificate of appealability**

In the event Movant wishes to appeal any aspect of this Court's decision, she is required to obtain a certificate of appealability (COA). 28 U.S.C. § 2253(c)(1)(b); Fed. R.App. P. 22(b). "The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." See Rule 11 of the Rules Governing Section 2255 Proceedings.

When a district court dismisses a petition on procedural grounds without addressing the merits of the petition, a COA should issue if the petitioner shows "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). When a plain procedural bar is present and the district court is correct to invoke it to dispose of the matter, a reasonable jurist could not conclude either that the court erred in dismissing the motion or that the petitioner should be allowed to proceed further. *Id.* In such a case, no appeal is warranted. *Id.*

The Court is satisfied in the instant case that no jurists of reason could find its procedural and substantive rulings to be debatable. Thus, the recommendation will be to deny a certificate of appealability.

**RECOMMENDATION**

The Magistrate Judge RECOMMENDS that the Court DENY Movant's amended motion and supplement pursuant to 28 U.S.C. § 2255 (DN 264 and 265) and DECLINE to issue a certificate of appealability.

**NOTICE**

Therefore, under the provisions of 28 U.S.C. §§ 636(b)(1)(B) and (C) and Fed.R.Civ.P. 72(b), the Magistrate Judge files these findings and recommendations with the Court and a copy shall forthwith be electronically transmitted or mailed to all parties.  Within fourteen (14) days after being served with a copy, any party may serve and file written objections to such findings and recommendations as provided by the Court.  If a party has objections, such objections must be timely filed or further appeal is waived. *Thomas v. Arn*, 728 F.2d 813 (6th Cir.1984).